# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-2057, 11-1393 & 11-3597

DAVID E. GROCHOCINSKI, not individually,
but solely in his capacity as the Chapter 7 Trustee
for the bankruptcy estate of CMGT, INC.,

*Plaintiff-Appellant/Cross-Appellee,*

and

EDWARD T. JOYCE AND ASSOCIATES,

*Cross-Appellee,*

and

APPEAL OF:

R. GERARD SPEHAR, Movant,

*Appellant,*

*v.*

MAYER BROWN ROWE & MAW, LLP, *et al.,*

*Defendants-Appellees/Cross-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-05486—**Virginia M. Kendall**, *Judge.*

ARGUED JANUARY 16, 2013—DECIDED JUNE 21, 2013

Before BAUER and HAMILTON, *Circuit Judges*, and MILLER, *District Judge.*[*]

HAMILTON, *Circuit Judge.* The story of Rumpelstiltskin is about turning straw into gold. The legal malpractice case at the heart of these appeals presents a modern attempt to turn metaphorical straw into real gold. The district court rejected the effort, as do we.

This case originated in a contract dispute between CMGT, Inc. and Spehar Capital, a company CMGT hired to help it find financing. Spehar Capital sued CMGT over a dispute related to this agreement and eventually procured a $17 million default judgment against CMGT, which had no assets to pay it. Spehar Capital devised a plan to recover on the judgment. Step one: force CMGT into bankruptcy. Step two: convince the bankruptcy trustee to bring a malpractice action against CMGT's law firm based on the theory that but for the law firm's negligence, Spehar Capital would never have obtained the default judgment. Step three: win the malpractice action or force a settlement for the nominal benefit of CMGT's bankruptcy estate. Step four: since Spehar Capital's claim on the bankruptcy estate dwarfs all others, Spehar Capital

---

[*] The Honorable Robert L. Miller, Jr., of the Northern District of Indiana, sitting by designation.

receives the lion's share of the payment to the bank-ruptcy estate. Result: Spehar Capital receives payment on the default judgment by convincing another court that the default judgment should never have been en-tered. A meritless default judgment would be trans-formed into a significant payout. Straw turns into gold.

We are now at step two. The bankruptcy trustee sued CMGT's law firm, known as Mayer Brown, the de-fendant here. The trustee claimed that Mayer Brown committed malpractice by failing to advise CMGT on the consequences of not settling its dispute with Spehar Capital and by failing to defend CMGT against Spehar Capital's suit. Mayer Brown moved to dismiss, arguing in part that this suit should be dismissed as a fraud on the court due to the inconsistency between the theory of the malpractice case and a recovery by Spehar Capital. The district court denied the motion to dismiss but granted discovery for the limited purpose of investigating the fraud on the court theory. Mayer Brown then moved for summary judgment, and the district court granted the motion, reasoning that the doctrine of judicial estoppel barred the inconsistencies in this suit, based on undisputed facts. We agree. If the trustee were to prevail in this suit, there would be a clear impression that one court was misled. In the related appeals, we affirm the denial of Gerard Spehar's motion for intervention and the denial of defendant Mayer Brown's motion for sanc-tions against plaintiff's counsel and the trustee.

I. *Factual Background*

  A. *CMGT*

CMGT was formed in 1999 to provide management services to the health care industry. CMGT owned software that made it easier for companies to track employee absences. While CMGT appears to have had a promising business idea, it lacked the start-up capital needed to implement its plan on the desired scale.

CMGT agreed to have Ronald Given, a partner with Mayer Brown, guide it through the process of obtaining financing.[1] The engagement letter provided that Mayer Brown would provide services "in connection with [CMGT's] initial capitalization, formative acquisition activities, and other related general corporate activities." In exchange, CMGT agreed to pay Mayer Brown 1.5 times the firm's normal hourly rates, but would owe nothing unless and until CMGT secured over $1 million in financing. Mayer Brown also retained the right to terminate the agreement if unpaid legal fees exceeded $50,000 or if CMGT did not secure financing by May 2000. May 2000 came and went without financing, but Mayer Brown continued to provide legal services with the hope that financing would materialize.

In June 2001, CMGT also hired Spehar Capital to assist in the search for investors. Spehar Capital pairs com-

---

[1] Mayer Brown and Ronald Given are both defendants in this action. Because the resolution of the issues in this appeal is the same for both defendants, we refer to them collectively as "Mayer Brown."

panies seeking investors with venture capitalists seeking investments. For this service, Spehar Capital receives a finder's fee. Its founder is Gerard Spehar. The agreement between CMGT and Spehar Capital, as amended on September 30, 2002, provided that Spehar Capital would receive a success fee "immediately at the successful closing of a funding" with a firm introduced to CMGT by Spehar Capital or with whom CMGT approved Spehar Capital to hold discussions. The firms that met these conditions were identified in an Exhibit A that was attached to the contract and could be "amended only by written addendum." Upon the closing of such a deal, CMGT was to pay Spehar Capital six percent of the capital raised. Spehar Capital was also to receive six percent of CMGT's common stock "[a]t such time as CMGT receives and accepts a Term Sheet or other commitment from an investor(s) for a minimum of $1,000,000," and Spehar Capital was to have exclusive investment banking rights. In addition, after the closing of a successful financing transaction, Spehar Capital was to receive a total of $100,000 in consulting fees spread over twelve consecutive months.

B. *The Trautner Deal*

In 2003, CMGT still needed an investor. In July 2003, a CMGT shareholder named Charles Trautner proposed solving CMGT's financial woes with what we will call the "Trautner deal." He proposed a spinoff transaction in which his investment group would form a new corporation that would purchase CMGT's assets for either

$500,000 or 20 percent of the new corporation's stock. To make the two options equivalent from the perspective of CMGT's shareholders, the new corporation would receive an initial capitalization of at least $2.5 million. CMGT's president, Lou Franco, signed a non-binding letter of intent with Trautner on August 1, 2003, and CMGT's shareholders then approved the deal on August 22, 2003. The Trautner deal was scheduled to close by September 30, 2003.

But a dispute with Spehar Capital derailed the Trautner deal, and that dispute spawned the malpractice action now before us. The Trautner deal did not provide for any payment to Spehar Capital. CMGT, with the advice of Mayer Brown, had concluded that the deal was outside the scope of its contract with Spehar Capital. According to CMGT, because the deal was arranged through channels independent of Spehar Capital and because Trautner was not included in Exhibit A, Spehar Capital was not entitled to any payment. Spehar Capital, however, maintained that it was entitled to payment. Spehar Capital alleged that CMGT asked Spehar to participate in conversations about the deal with Trautner and that CMGT unreasonably refused to add Trautner to the list on Exhibit A after Spehar Capital found out about the proposed Trautner deal on August 8, 2003.

Over the next month, Spehar Capital and CMGT were unable to reach any resolution, though the extent to which they engaged in settlement negotiations is disputed. Mayer Brown contends it is absurd to suggest CMGT could settle because CMGT had no money with

which to settle or even to defend the litigation. The trustee contends that Spehar Capital wanted to settle and that CMGT could have offered to settle with a percentage of future financing proceeds.

The trustee also contends that Mayer Brown negligently failed to advise CMGT about the risk of not settling for the future of CMGT. As an example of this failure, the trustee points to an August 26, 2003 email in which the president of CMGT, based on advice from Mayer Brown, sent a letter to the shareholders conveying confidence that "any claims against the transaction will not succeed and, as a practical matter, the only substantive effect we will be facing is additional documentation complexity and a delay in the winding up of CMGT . . . ."

According to the trustee, Mayer Brown failed to provide adequate advice to CMGT because the law firm had negotiated a "functionally equivalent" deal with Trautner that would have allowed Trautner essentially to assume CMGT's business without formally purchasing CMGT's assets from its shareholders. This alternative deal envisioned assigning CMGT's existing contracts to the new company formed by Trautner. CMGT would pay the new company for servicing CMGT's contracts, including its accrued legal fees owed to Mayer Brown, which would be paid on CMGT's behalf. In effect the deal would have given Trautner the benefit of the Trautner deal and Mayer Brown would have received payment of its fees without having to worry about Spehar Capital's claim. According to the trustee,

however, this alternative deal was not in the interest of CMGT or its shareholders because CMGT would lose all of its revenue stream — the contracts that would be serviced by the new corporation.

C. *The California Suit*

On September 9, 2003, Spehar Capital followed through with its threat to sue, filing a complaint in a California state court. We refer to this action as "the California suit." On September 12, the California court granted an *ex parte* temporary restraining order enjoining CMGT from closing the Trautner deal or any other deal whose terms did not comply with the CMGT-Spehar Capital agreement. Attorney Given of Mayer Brown forwarded the order to CMGT's president and shareholders. He informed them of the order and reminded them that Mayer Brown had not been retained to defend CMGT in the California suit. Given later told the shareholders that CMGT did not have money to contest the lawsuit and that CMGT could "no longer act on [the share-holders'] behalf to protect [their] interests from Gerry Spehar." This email, however, also provided advice on the merits of the California suit and invited CMGT's shareholders and chief operating officer to contact Mayer Brown with any questions about the lawsuit. On October 3, the temporary restraining order was converted into a preliminary injunction. CMGT never appeared to defend the suit, nor did any CMGT shareholder.

In November 2003, Spehar Capital amended its complaint in the California suit to include a claim for dam-

ages. CMGT still did not appear, and the California court entered a default judgment in favor of Spehar Capital for $17,045,780 on March 18, 2004. This represented legal expenses, the $150,000 success fee, and the $100,000 management consulting fee that Spehar Capital claimed it should receive if it assisted with the successful closing of a financing deal. The vast bulk of the judgment was based on supposed values of $11,253,627 in stock compensation and $5,483,290 for the lost exclusive investment banking rights. The values of the stock compensation and investment banking rights were calculated based on the projected value of a speculative planned initial public offering in 2006 — a figure Spehar obtained from CMGT's promotional materials from several years earlier. At the prove-up hearing in California, Spehar testified to all of these damages.

This state court judgment is not subject to collateral attack in these proceedings. We are nevertheless troubled by aspects of the judgment that are relevant to our case. First, there was considerable tension between the injunctive relief and the damage award. The damage award rests on the premise that the Trautner deal would have closed. Recall, though, that the same court's injunction — issued *ex parte* at Spehar Capital's behest on claims of irreparable harm — enjoined the closing of the same Trautner deal, thus prohibiting CMGT from receiving the very funding that Spehar Capital claimed it had helped secure. Second, the valuation of the stock options and the investment banking rights based on a speculative IPO three years in the future is extraordinary, to put it mildly. At the time Spehar Capital

sought the default judgment, CMGT was valued in the red. It had just agreed to a deal in which it would sell its *assets* (without the liabilities) for a grand total of just $500,000. Yet according to Spehar Capital and the California court that entered the default judgment, the real value of CMGT was more than $180 million. This assumed that the tiny new company would have enjoyed truly meteoric success. Perhaps this is why the California judge said, upon entering the judgment, that he doubted Spehar Capital would ever collect because CMGT would "set [the Default Judgment] aside, walk away from the company or they will go bankrupt." In other words, the judge who made the damages findings did not expect the judgment would ever be collected.

The judge was right, but may have underestimated Spehar Capital's creativity. The last of his predictions proved true. CMGT never paid the default judgment, and Spehar Capital forced CMGT into bankruptcy, filing an involuntary bankruptcy petition on August 25, 2004. On September 21, 2004, David Grochocinski was appointed to serve as the trustee. He did not move to vacate the default judgment before the time to do so expired under California law. This brings us to the present litigation.[2]

---

[2] It is disputed whether the trustee could have successfully vacated the default judgment. Under California law, a party may move to vacate a default judgment within six months of the entry of the judgment. Cal. Civ. Proc. Code § 473(b). The motion must be accompanied by a copy of the proposed answer. Relief from judgment is at the court's discretion

(continued...)

D. *The Present Dispute*

Shortly after Grochocinski was appointed trustee of CMGT's estate, Spehar Capital approached him about bringing a malpractice action against CMGT's attorneys, Given and the Mayer Brown firm. The bankrupt CMGT had essentially no assets, so Spehar Capital's only hope for recovering on the default judgment in the California suit was to convince the trustee to sue CMGT's lawyers for malpractice. Since the CMGT estate had no money to fund litigation, the trustee was unwilling to invest in litigation on behalf of the no-asset estate that would benefit only a single secured creditor — Spehar Capital. The trustee nevertheless encouraged Spehar to hire counsel to investigate whether a malpractice claim would be viable.

Eventually, Spehar Capital and the trustee entered into a post-petition financing agreement to help fund the investigation into the malpractice action and to ensure

---

(...continued)

unless the application for relief is "accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect," in which case the judgment must be vacated. *Id.* Because the six-month period had not run before the bankruptcy court issued the order of relief on September 15, 2004, the trustee had until November 15, 2004 to move to vacate the judgment. 11 U.S.C. § 108(b). According to the trustee, he spent 30 minutes studying the California statute after his appointment on September 21 and concluded that it would not be feasible for the estate, which had no assets at the time, to try to vacate the judgment.

that CMGT's unsecured creditors would receive a fraction of any recovery. The agreement provided that Spehar Capital would advance the estate $5,000 for the costs of investigating the malpractice claim (an amount that could be increased to $18,500). If the estate recovered on the claim, Spehar Capital would receive, depending on the specific amount, approximately 80 to 90 percent of the net recovery after expenses (including the attorney's contingency fee).[3] The agreement was accepted by the bankruptcy court on September 2, 2005, and no creditors exercised their right to object to its terms. After the agreement was made, Spehar Capital filed a proof of claim for a secured amount of $13,427,560 and an unsecured claim for $3,618,220.[4]

---

[3] This recovery is less than Spehar Capital would be entitled to under the bankruptcy code. At the time the agreement was signed, it was unclear whether Spehar Capital was a secured creditor or an unsecured creditor. To our knowledge the estate has no other secured creditors. Therefore, if Spehar Capital were a secured creditor, without the agreement, Spehar Capital would receive full payment on its secured claim before any of the other creditors would be compensated. If Spehar Capital were an unsecured creditor, it would receive approximately 90 percent of any recovery under a pro rata distribution because its $17 million claim constitutes over 90 percent of the claims on the estate. In both scenarios, Spehar Capital would receive less under the financing agreement than it would have without the agreement.

[4] The trustee challenged the secured claim on the ground that Spehar Capital did not properly serve CMGT with a cita-

(continued...)

Spehar Capital then recommended to the trustee a lawyer specializing in malpractice who would handle the case for a contingent fee. The trustee requested CMGT's case file from Mayer Brown and provided it to Spehar Capital and its preferred lawyer for investigation. The proposed counsel declined to take the case. Spehar Capital then recommended that the trustee hire attorney Edward Joyce in his place, which the trustee did. As the statute of limitations deadline approached, Spehar Capital became increasingly anxious about whether the suit would be filed. The trustee responded that he was leaving the decision to file or not in Joyce's hands.

---

[4] (...continued)
tion to discover assets before filing the bankruptcy petition. Before filing the bankruptcy petition, Spehar Capital acted to ensure that it would have a secured claim against CMGT. Spehar Capital domesticated the California judgment in Illinois on March 31, 2004 and then filed a citation notice and a notice to discover assets in Illinois court. Under Illinois law, filing a citation enables a creditor to attach a secured lien to the property of the debtor. Illinois, however, requires that the citation be served on the debtor, and the bankruptcy judge held that proper service did not occur here. *In re CMGT, Inc.*, 402 B.R. 262 (Bankr. N.D. Ill 2009). The district court reversed, reasoning that the post-petition financing order prevented the trustee from arguing that Spehar Capital did not have a secured claim. *In re CMGT*, 424 B.R. 355 (N.D. Ill. 2010).

E. *Procedural History*

On August 23, 2005, the trustee, through counsel Joyce, filed this action in Illinois state court. The complaint contained two counts of malpractice that the trustee is still pursuing.[5] Count I alleges that Mayer Brown negligently advised CMGT with respect to the consequences of Spehar Capital filing suit and that as a result, CMGT was unable to close the Trautner deal or any other financing deal. If CMGT had closed a deal, the trustee alleges, it would have become a highly profitable company; instead, CMGT went bankrupt. Among other alleged failures, Mayer Brown supposedly failed to advise CMGT "that a very probable consequence of a lawsuit by [Spehar Capital], regardless of its merit, would be that CMGT would not receive funding from any source." Count II alleges that Mayer Brown failed to defend CMGT adequately (or failed to make clear that it would not defend CMGT) against Spehar Capital's lawsuit and that as a result, CMGT sustained damages in the amount of the $17 million default judgment. Mayer Brown promptly removed to federal court under the bankruptcy removal statute, 28 U.S.C. § 1452, and the district court properly exercised jurisdiction because this dispute is "related to" a bankruptcy proceeding. (Any money recovered from Mayer Brown will increase the value of the bankruptcy estate.) See 28 U.S.C. § 1334(b); *Black v. USPS* (*In re Heath*), 115 F.3d 521, 524 (7th Cir.

---

[5] The original complaint alleged four counts of malpractice. Counts III and IV have been dismissed voluntarily.

1997) (proceeding is related to a bankruptcy when it is "likely to affect the debtor's estate").

Mayer Brown next moved to dismiss this unusual case, both for failure to state a claim and under the theory that the case was brought with "unclean hands" as part of a fraud on the court system orchestrated by Spehar Capital to secure a bogus default judgment and then collect it in bankruptcy through a meritless malpractice action. The district court denied the majority of Mayer Brown's motion. The court was initially not convinced by the fraud on the court theory because the trustee — not Spehar Capital — had brought the malpractice action, and because Mayer Brown did not present clear evidence that the trustee had perpetrated any fraud on the judicial system. *Grochocinski v. Mayer Brown Rowe & Maw LLP*, No. 06 C 5486, 2007 WL 1875995, at *3-4 (N.D. Ill. June 28, 2007). The court also found that the trustee pled a sufficient claim for malpractice under Count II and much of Count I.[6]

---

[6] Specifically, the court rejected Mayer Brown's arguments that the trustee's failure to vacate the $17 million default judgment necessarily made the trustee, at least as a matter of law, the proximate cause of the loss and that the $17 million default judgment could not constitute damages for malpractice under Illinois law because it had never been paid. *Grochocinski v. Mayer Brown Rowe & Maw LLP*, No. 06 C 5486, 2007 WL 1875995, *7-12 (N.D. Ill. June 28, 2007). The court also found that the language of Mayer Brown's engagement letter did not foreclose as a matter of law the possible existence of a duty

(continued...)

Mayer Brown moved to reconsider. The court denied the motion but noted that it now found the "unclean hands" theory "very persuasive" and opened discovery for the limited purpose of investigating the issue. *Grochocinski v. Mayer Brown Rowe & Maw LLP*, No. 06 C 5486, 2010 WL 1407256, at *8 (N.D. Ill. Mar. 31, 2010). After discovery, Mayer Brown moved for summary judgment on its unclean hands theory, arguing that it would be absurd for Spehar Capital to receive the lion's share of any recovery when proving the causation element of malpractice would require the trustee to prove that Spehar Capital had never been entitled to prevail in the California suit.

The district court granted summary judgment in favor of Mayer Brown. The district court did not apply the doctrine of unclean hands but instead relied on the doctrine of judicial estoppel, holding that it prevented the trustee from taking a position in this lawsuit inconsistent with Spehar Capital's position in the California suit. Acknowledging that the parties to this suit are different from the California suit, the district court found this was not a per se bar because judicial estoppel is "concerned solely with protecting the integrity of the

---

[6] (...continued)

of care to CMGT and that several other alleged acts of malpractice could be actionable. We do not address any of those issues here. The district court also found, though, that Mayer Brown could not be liable for failure to advise that Spehar Capital would sue or for failure to provide legal advice to CMGT's shareholders. *Id*. at *8-9.

courts, not the relationship between the parties to the prior litigation." *Id.* at *10. The court found it appropriate to bind the trustee to Spehar Capital's prior conduct because the trustee "acted at all times as a proxy for the real party in this case, SC." *Id.*, citing *Taylor v. Sturgell*, 553 U.S. 880 (2008) (recognizing exception to rule against non-party preclusion for relitigation through proxy). The court then found that Spehar Capital's judgment in the California suit was inconsistent with the trustee's need to prove in the malpractice suit that Spehar Capital was never entitled to the judgment in the first place and that without this argument, the malpractice action failed as a matter of law. In two later proceedings, the district court denied Gerard Spehar's post-judgment motion to intervene and denied nearly all of Mayer Brown's motion for sanctions against the trustee and his lawyer Joyce. The trustee, Spehar, and Mayer Brown have all appealed. The appeals were consolidated and we have jurisdiction over each as an appeal from a final judgment pursuant to 28 U.S.C. § 1291.

II. *Summary Judgment in Favor of Mayer Brown*

Summary judgment is appropriate if there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We review the district court's grant of summary judgment *de novo*, giving the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it. See *Good v. Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 673 (7th Cir. 2012). We

may affirm the grant of summary judgment on "any alternative basis found in the record as long as that basis was adequately considered by the district court and the nonmoving party had an opportunity to contest it." *Best v. City of Portland*, 554 F.3d 698, 702 (7th Cir. 2009). On appeal, the trustee argues that the district court erred in applying judicial estoppel by attributing to the estate Spehar Capital's previous litigation conduct. We find no fault with the application of judicial estoppel in this case.

Judicial estoppel is a flexible equitable doctrine designed to prevent "the perversion of the judicial process." *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990). The doctrine protects the courts from being "'manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories.'" *Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 527 (7th Cir. 1999) (quotations omitted); *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) ("the purpose of the doctrine . . . is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant"). It may be raised by any party, regardless of whether the party was prejudiced by the inconsistency, or by the court on its own motion. See *In re Cassidy*, 892 F.2d at 641. Because the doctrine is a "matter of equitable judgment and discretion," we review a district court's application of the doctrine for an abuse of that discretion. *In re Knight-Celotex, LLC*, 695 F.3d 714, 721 (7th Cir. 2012).

The application of judicial estoppel is "not reducible to any general formulation of principle," though the

inquiry is typically informed by several factors. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotation omitted). The Supreme Court has identified three considerations to help guide the inquiry: (1) whether "a party's later position must be clearly inconsistent with its earlier position;" (2) whether "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;" and (3) whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id*. at 750-51 (quotations omitted). We have emphasized that these are not rigid requirements but "general guideposts that must be considered in the context of all the relevant equities in any given case." *In re Knight-Celotex, LLC*, 695 F.3d at 722.

The trustee bases his appeal on a question of first impression: What showing is required to apply judicial estoppel to a litigant based on the litigation positions of someone else?[7] The trustee argues that the district court erred in applying judicial estoppel by attributing to the estate Spehar Capital's previous litigation positions. According to the trustee, estoppel based in part on

---

[7] The trustee has not objected to the applicability of any of the other judicial estoppel factors, so we consider any such arguments waived. See *Carroll v. Lynch*, 698 F.3d 561, 567-68 (7th Cir. 2012).

the conduct of a non-party must comport with the exceptions to non-party preclusion identified in *Taylor v. Sturgell*, 553 U.S. 880 (2008), and the district court erred in concluding that one of these limited exceptions was met, at least as a matter of law on summary judgment. Mayer Brown responds that judicial estoppel is more flexible than the preclusion doctrines and can be applied regardless of whether the case meets an exception identified in *Taylor*.[8]

We agree with Mayer Brown that the applicability of judicial estoppel is not limited to the exceptions for

---

[8] *Taylor* addressed whether the doctrines of claim and issue preclusion could bind a non-party to a judgment in an identical suit if the non-party was "virtually represented" by a party. The government asked the Supreme Court to adopt a "heavily fact-driven" and "equitable" approach to non-party claim and issue preclusion through which a court would make a "close enough" determination of whether a non-party should be precluded. *Taylor*, 553 U.S. at 898-99. The Supreme Court concluded that such a "diffuse balancing" approach did not provide sufficient respect for the fundamental nature of the general rule that "'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Id.* at 893, quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). The Court concluded that only discrete, clearly delineated exceptions are consistent with the fundamental guarantee to one's own day in court. Because we find *Taylor* inapplicable to this case, we express no view on whether the facts of this case fall within one of the discrete exceptions recognized in *Taylor*.

claim and issue preclusion identified in *Taylor*. Judicial estoppel is more flexible than the claim and issue preclusion doctrines that were the concern in *Taylor*. It is true that both the preclusion doctrines and judicial estoppel attempt to ensure consistent results across proceedings. *E.g., Montana v. United States*, 440 U.S. 147, 154 (1979) (noting that claim preclusion "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions"). But judicial estoppel is concerned more generally with protecting the integrity of the courts from the appearance and reality of manipulative litigation conduct. See *New Hampshire*, 532 U.S. at 749-50 (collecting cases that "have uniformly recognized that [the doctrine's] purpose is to protect the integrity of the judicial process") (quotations omitted). Judicial estoppel is a flexible equitable doctrine that is not "reducible to any general formulation of principle" and accordingly does not lend itself to rigid rules. *Id*. at 750. To protect the integrity of the judicial process, a court needs freedom to consider the equities of an entire case. Therefore it is appropriate for a court considering judicial estoppel effects of a non-party's condut to engage in an equitable inquiry that turns on the specific circumstances of an individual case. With this in mind, we turn to the equities of this case.

The district court concluded that the unusual circumstances of this case made it equitable to treat the trustee and Spehar Capital as the same entity so that positions taken by Spehar Capital in the California suit would be attributed to the trustee for purposes of judicial estoppel. The court pointed to a wealth of undisputed evidence

demonstrating the appropriateness of treating Spehar Capital and the trustee as one and the same for this purpose. Spehar Capital was instrumental in or-chestrating both the bankruptcy and the filing of this suit. Spehar Capital forced CMGT into bankruptcy for the purpose of convincing the trustee to bring a mal-practice action against CMGT's counsel. Once CMGT was in bankruptcy, Spehar Capital approached the trustee about bringing this suit. When the trustee was reluctant, Spehar Capital agreed to lend the trustee money to investigate the possible claim and to carve out a small portion of any recovery for the benefit of the unsecured creditors. Spehar Capital then recommended the attorney to bring the suit and frequently com-municated with the attorney. And of course, Spehar Capital was set to receive the lion's share of any recov-ery. Together, all of these undisputed facts convinced the district court that it was appropriate to hold the trustee accountable for the positions taken by Spehar Capital in the California suit. *Grochocinski*, 2010 WL 1407256, at *14. Once Spehar Capital's conduct was con-sidered, the district judge concluded that it would be inconsistent for the trustee to prevail in the malpractice case, for the benefit of Spehar Capital, on the theory that Spehar Capital never should have obtained the judgment in the California suit. And without this argument, the court concluded, the mal-practice action failed as a matter of law.

Based on the undisputed facts, the district court did not abuse its discretion in reaching this conclusion as a matter of its equitable judgment. This is not merely

a case where the creditor of an estate previously took a litigation position inconsistent with a position taken by the trustee. Rather, Spehar Capital was intimately involved in the genesis and the hoped-for end of this suit. Spehar Capital forced CMGT into bankruptcy for the purpose of allowing this suit to be brought and, after filing the bankruptcy petition, worked tirelessly to convince the trustee to bring suit. Given Spehar Capital's significant involvement in this case, if the trustee were to prevail in this suit and Spehar Capital were to receive the lion's share of the recovery, the courts would have been abused and misled. Preventing such a reality and perception is a core purpose of judicial estoppel. The district court's opinion clearly showed Spehar Capital's intimate involvement in this case and how this involvement created the impression that the courts were being misused. The consideration of Spehar Capital's previous litigation was consistent with the aims of judicial estoppel, and the district court did not abuse its discretion by attributing Spehar Capital's litigation conduct to the trustee.

The trustee also argues that judicial estoppel is inequitable here because it will unfairly prevent the innocent unsecured creditors from receiving any recovery. In other circumstances, this could be a serious concern, but it does not sway the equities in this case. Had it not been for Spehar Capital's insistence, this suit never would have been brought. Before Spehar contacted the trustee about bringing this action, the trustee was prepared to terminate the bankruptcy as a no-asset estate. If the trustee had followed that course, the unsecured

creditors would have received no recovery as well. Since this suit would not have been brought but for Spehar Capital and the bulk of any recovery would wind up in its pockets, it was not an abuse of discretion to conclude that foreclosing the unsecured creditors' recovery did not tip the scales against the use of judicial estoppel. We affirm the grant of summary judgment in favor of Mayer Brown.

III. *Intervention*

Also before this court is Gerard Spehar's appeal of the denial of his motion to intervene pursuant to Federal Rule of Civil Procedure 24. Mr. Spehar argues that he should be allowed to intervene both as of right and permissively because his professional reputation and ability to earn a living were placed at issue in this suit when the district court concluded that he had orchestrated an attempted fraud on the court. Mr. Spehar moved to intervene on April 28, 2010, nearly one month after the district court granted summary judgment in favor of Mayer Brown and over two and a half years after the court granted discovery on the defendants' fraud on the court theory. The district court denied the motion to intervene as untimely. *Grochocinski v. Mayer Brown Rowe & Maw LLP*, No. 06 C 5486, 2011 WL 382737 (N.D. Ill. Feb. 3, 2011). We review the denial of a motion for intervention as untimely for abuse of discretion. *B.H. v. McDonald*, 49 F.3d 294, 297 (7th Cir. 1995). We find no merit in the appeal and affirm.

Rule 24 provides two avenues for intervention, either of which must be pursued by a timely motion. See *Heartwood, Inc. v. U.S. Forest Serv.*, 316 F.3d 694, 701 (7th Cir. 2003). The timeliness requirement forces interested non-parties to seek to intervene promptly so as not to upset the progress made toward resolving a dispute. We look to four factors to determine whether a motion is timely: "(1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties by the delay; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances." *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000).[9]

The district court found that each of the four factors weighed against the timeliness of Spehar's motion. First, the court concluded that Spehar should have known that his personal and professional interests may have been affected by this suit on October 30, 2007 when the court granted discovery on the "unclean hands" defense. The court noted that Spehar was actually aware of the

---

[9] A court must permit a non-party to intervene as of right if he "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. Rule 24(a)(2). If a person cannot intervene as of right, a court may permit him to intervene if he "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).

issue because he notified the CFA Institute of the allegations against him in the suit, yet he did not move to intervene until April 28, 2010, after the district court had already granted summary judgment. Second, allowing intervention would have prejudiced Mayer Brown because it would have caused additional delay in resolving this case, which had reached a final judgment. Third, the court found that Spehar would not be significantly prejudiced because he was heavily involved in the lawsuit behind the scenes, and the trustee had adequately rebutted the personal attacks Mayer Brown had made against Spehar. Fourth, there were no other unusual circumstances justifying intervention.

Spehar raises a number of frail arguments challenging the district court's ruling. First, he argues that allowing intervention and vacating the final judgment would cause no prejudice to Mayer Brown because no merits discovery has occurred in the case. This argument ignores the costs Mayer Brown had already incurred investigating and briefing the issues in the district court before the motion to intervene. Second, Spehar argues that he first learned that his professional reputation was at issue in this case when the district court granted summary judgment on March 31, 2010. He claims that the "unclean hands" defense referred only to the conduct of the trustee. This is simply not true. In its opinion denying Mayer Brown's motion to dismiss issued on June 28, 2007, the court made clear that the "unclean hands" argument focused on Mr. Spehar. The court found that the "most obvious problem with the Lawyer Defendant's argument is that Spehar — which

is not a party to this action — is the entity that had allegedly orchestrated a 'fraud on the judicial system.'" *Grochocinski v. Mayer Brown Rowe & Maw LLP*, No. 06 C 5486, 2007 WL 1875995, at *4 (N.D. Ill. June 28, 2007). When the court granted discovery on this defense on October 30, 2007, Spehar could have missed the implications for his reputation only if he was willfully blind to them. Third, Spehar argues that the district court discounted the severe prejudice he will suffer from the denial of intervention because the court's findings have left him "effectively unemployable." Although we are skeptical that this prejudice is "an interest relating to the property or transaction that is the subject of the action," even if it were, the district court acted well within its discretion to conclude that the motion for intervention — filed two and a half years after Spehar knew his reputation may be at issue in the case — was untimely.[10]

---

[10] We affirm the denial of intervention as untimely without reaching an obvious and much more fundamental issue: whether the reputational interests of a witness in case can support the witness' intervention in the case *as a party*. Judges and juries must often evaluate the conduct and credibility of people and institutions that are not parties. Judges' findings and comments are often critical of non-parties, not gratuitously but as a necessary part of deciding the cases properly before them. To hold that the prospect of a judge's adverse finding or comment could support intervention as a party, with rights to appeal, for example, even if the original parties are satisfied with the outcome, would amount to a stunning expansion of standing and would invite prolonged and even endless litigation.

IV. *Cross-appeal on Sanctions*

We turn now to Mayer Brown's cross-appeal of the denial of its motions for sanctions against the trustee and attorney Joyce for prosecuting a frivolous and fraudulent claim. Mayer Brown sought sanctions in the district court against both under the court's inherent authority and against Joyce under 28 U.S.C. § 1927, as well.

The federal courts have the inherent power to impose a wide range of sanctions upon parties for abusive litigation. This inherent power, however, is limited to "cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991); see also *Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009). There is no single litmus test for determining what constitutes bad faith, though more than mere negligence is required. See *Maynard v. Nygren*, 332 F.3d 462, 471 (7th Cir. 2003) (noting court has "no authority under the Rules or under the inherent powers of the court to sanction attorneys for mere negligence"). Sanctions against counsel under 28 U.S.C. § 1927 are appropriate when "counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders." *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184-85 (7th Cir. 1992).

The district court found that the trustee was negligent in entrusting the case to Joyce without actively monitoring the litigation but that sanctions were not appropriate because his conduct was not more than "mere

negligence." *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 452 B.R. 676, 683 (N.D. Ill. 2011). The court also concluded that sanctions were not appropriate for Joyce because his arguments against the fraud on the court defense "were not frivolous." *Id.* at 685. We review the denial of sanctions for abuse of discretion. *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006). We conclude that the district court did not abuse its discretion.

A. *Trustee Grochocinski*

The district court concluded that sanctions against the trustee were unwarranted because he was not more than negligent. In support of this conclusion, the court focused on the fact that the trustee had no professional experience with legal malpractice claims and relied on his special counsel to prosecute the case. According to the court, the trustee's reliance on special counsel without significant oversight was negligent but not worse. *Grochocinski*, 452 B.R. at 684 (citing 11 U.S.C. § 327(a), which "specifically provides for the employment of special counsel"). Mayer Brown argues that this conclusion was an abuse of discretion both because the district court applied the incorrect law and because the factual conclusion was unreasonable. We disagree.

First, Mayer Brown contends the district court erred by employing the more forgiving "willful and deliberate" standard to the trustee's conduct. It is well established that a bankruptcy trustee may not be held personally

liable for a breach of her fiduciary duties unless the breach was "willful and deliberate . . . ." *In re Chicago Pacific Corp.*, 773 F.2d 909, 915 (7th Cir. 1985). Mayer Brown argues that it was error to apply this standard because the willful and deliberate standard should govern only motions for sanctions for breaches of a trustee's *fiduciary duties*, not sanctions for *litigation conduct*. This distinction makes intuitive sense, but we need not determine whether bankruptcy trustees are always subject to the willful and deliberate standard because the choice of standard is not decisive in this case. The choice of standard did not affect the outcome of the sanctions motion because the district judge concluded that the trustee was not more than negligent, and negligence alone is not a sufficient basis for issuing sanctions under the court's inherent authority. See *Maynard*, 332 F.3d at 471.

Second, Mayer Brown argues that it was unreasonable for the court to conclude that the trustee's behavior was not more than negligent while at the same time dismissing the suit as a fraud on the court. Mayer Brown contends that the trustee was more than negligent in allowing this case to be filed because he knew that Spehar Capital's default judgment was unfounded and that the suit was a vehicle for Spehar Capital to collect on the judgment. Moreover, the trustee failed to conduct an independent investigation into the underlying facts of the case and instead was content to rely on Spehar's representations. Thus, he "willingly allowed his office to become the vehicle for the fraud."

While these arguments have considerable force and could have persuaded another judge to impose sanctions, abuse of discretion is a deferential standard that permits different courts to reach different results so long as the results are within the bounds of reason. The flexibility we afford district judges on matters within their discretion reflects the idea that their firsthand familiarity with a case makes them better situated to resolve issues committed to their discretion. An "abuse occurs only when a court has acted contrary to the law or reached an unreasonable result." *Sokolik v. Milwaukee Sch. of Eng'g* (*In re Sokolik*), 635 F.3d 261, 269 (7th Cir. 2011).

Here we cannot say that the district court's decision not to award sanctions was unreasonable. This is not a case in which the district judge failed to appreciate the gravity of the conduct. To the contrary, the district judge was obviously troubled by this case. The court's opinions issued throughout this litigation did not hold back in criticizing Spehar, Joyce, and the trustee, yet despite this clear recognition of troublesome conduct, the district judge concluded that sanctions were inappropriate. Members of this panel might have come to a different conclusion, but given the thoroughness of the district court's analysis and its clear recognition of the gravity of the alleged misconduct, we cannot say that the decision to deny sanctions against the trustee was unreasonable.

B. *Attorney Joyce*

The district court also concluded that sanctions were unwarranted against attorney Joyce under the court's

inherent authority and 28 U.S.C. § 1927. The court found that sanctions were inappropriate because the malpractice claims in the complaint were not unfounded and Joyce did not unreasonably prolong the proceedings in contesting the "unclean hands" defense. Mayer Brown argues that this was error, raising objections similar to those regarding the denial of sanctions against the trustee.[11]

Mayer Brown contends that the district court erred in its conclusion that attorney Joyce did not persist in making frivolous claims to the court after Mayer Brown first raised its fraud on the court defense. According to Mayer Brown, the motion to dismiss put Joyce on notice of the problems with the suit, and he should have dismissed the case voluntarily. The district court, however, found that Joyce's responses to Mayer Brown's motions to dismiss and for summary judgment contained arguments that were not frivolous. The court recognized that the fraud on the court defense was novel and that Joyce had a reasonable argument that judicial estoppel should not apply in this case. *Grochocinski*, 452 B.R. at 685-86. While it would have been preferable if Joyce had decided not to bring this case at all, the district court did not act unreasonably in concluding that he did not make frivolous claims before the court. The

---

[11] The district court concluded the same reasons that weighed against sanctions under section 1927 applied to the court's inherent authority. For simplicity, we address the issues together.

applicability of judicial estoppel (and Mayer Brown's other defenses) to this case was not clearly established before Joyce brought suit, and there were reasonable but ultimately unpersuasive grounds for arguing that the estate should not be held to account for Spehar Capital's inconsistent conduct. We have rejected those arguments on the merits, but the district court did not abuse its discretion in denying sanctions under section 1927 or under the court's inherent authority.

V. *Conclusion*

We hope this peculiar and misguided case has reached its end. We AFFIRM the grant of summary judgment in favor of the defendants. We also AFFIRM the denial of Mr. Spehar's motion to intervene and the denial of sanctions against the trustee and attorney Joyce.