In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-1907

TRADE WELL INTERNATIONAL,

*Plaintiff,*

*v.*

UNITED CENTRAL BANK,

*Defendant-Appellee.*

APPEAL OF MAURICE J. SALEM,

*Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 12-cv-701-wmc — **William M. Conley,** *Chief Judge.*

ARGUED NOVEMBER 19, 2014 — DECIDED FEBRUARY 10, 2015

Before WOOD, *Chief Judge,* and KANNE and TINDER, *Circuit Judges.*

WOOD, *Chief Judge.* Maurice Salem, a member of the New York Bar, was admitted *pro hac vice* in the U.S. District Court for the Western District of Wisconsin in connection with some commercial litigation. Salem represents Trade Well

International, a Pakistani company, which was suing United Central Bank (the Bank) for damages and the return of property that was left behind in a hotel that the Bank owned. Problems arose when Salem filed a Notice of Lien on behalf of his client; the Notice stated that there was a lien on the hotel and purported to provide notice of the litigation. The district court, concluding that the Notice was defective in several ways, held Salem in contempt of court, revoked his *pro hac vice* status, barred him from practicing in the Western District of Wisconsin for three years, and imposed a $500 fine. Salem, representing himself, has appealed. The Bank argues that we have no jurisdiction to entertain his appeal, but we conclude otherwise. On the merits, we find that the court's orders must be set aside: nothing Salem did warranted a finding of contempt, nor these sanctions.

**I**

Because we are reversing the district court in spite of the substantial discretion the court possesses in this kind of matter, we think it useful to include a full explanation of the underlying facts. Trade Well is a company that provides furnishings for hotels. In February 2010, it entered into a lease with Dells Estate LLC, a Wisconsin company that owned a hotel called the Dells Island Resort (the Hotel). The lease agreement states that Trade Well was to provide certain goods and movable items to the Hotel for four years, for a fee of $250,000 per year. An inventory of the items to be provided lists furnishings, various linens (mattresses, curtains, sheets, towels, bath mats, and table cloths), fixtures (chandeliers, wall-mounted lamps, Jacuzzis, an LED light, signs), a reservation system, and remodeling services for several rooms. The agreement specified that it is "binding upon" the

parties' successors and that at the termination or expiration of the lease, "any or all goods/movable properties … shall constitute the property of and be handed over to" Trade Well.

Dells Estate had financed its purchase of the Hotel with a mortgage from United Central Bank, a Texas corporation. It defaulted on the mortgage in 2010, shortly after Trade Well had provided the items called for by the lease. The Bank eventually obtained a foreclosure judgment and purchased the Hotel at a sheriff's sale in 2012. At that time, all of the leased items were still inside the Hotel. Because the Bank did not want to hold the Hotel indefinitely, it promptly started looking for a buyer. Trade Well demanded the return of the leased property, but the Bank refused.

When its demands were spurned, Trade Well sued the Bank for replevin in federal court (invoking the diversity jurisdiction, 28 U.S.C. § 1332). As a preliminary matter, it moved for an order compelling the Bank to permit inspection of the leased items for purposes of taking an inventory and ensuring proper storage. The district court granted that motion. The inspection revealed that many of the items were missing, some were damaged, and some were moldy.

In October 2013 (approximately a year after the suit was filed), Trade Well moved to stay the Bank's sale of the Hotel. Salem, its attorney, informed the court that he recently had learned from a potential buyer, Edward Krause, that the Bank was trying to sell the Hotel along with the leased items. Trade Well argued that a stay was warranted, because a sale to a third party would transfer possession of the leased items and would complicate matters.

The Bank opposed the motion and asked instead that the court order Trade Well to take possession of the latter's property. Critically, however, the Bank's motion was expressly limited to "personal property"; the Bank maintained that it owned the hotel's fixtures, including some installed Jacuzzis. It argued in the alternative that Trade Well should pay it for storing the personal property until it was removed and post a bond for the estimated storage costs. The Bank did not, however, file a counterclaim.

Trade Well responded that its motion was intended only to "stop the transfer of *possession* of the damaged equipment" (emphasis added), because a transfer would make it "very difficult, or impossible to determine who caused the damage." Trade Well also charged that the Bank had converted some of the leased items into fixtures (though it did not specify which ones it meant). Once again, Salem filed a supporting declaration, in which he stated that Trade Well sought only to take immediate possession of undamaged goods, while leaving the damaged items and fixtures in place pending resolution of the suit. While these motions were pending, Trade Well amended its complaint to add claims of negligence and conversion. It repeated its assertions that the Bank had damaged Trade Well's property through improper storage and had converted some of it.

At that point, the district court ruled on the pending motions. It stayed the sale of the hotel for 30 days so that Trade Well could remove everything listed in the inventory attached to its complaint, with the exception of the Jacuzzis and materials related to the remodeling. The order continued, "All items on [the inventory] other than the Jacuzzis and remodeling that have not been removed within 30 days

shall be deemed abandoned by Trade Well absent an extension of this deadline by the court upon good cause shown."

About two weeks later, Trade Well asked the court to extend the deadline for moving the items and to compel the Bank to pay for the moving and storage of damaged items. Salem supported the latter part of the motion with a declaration and copies of emails showing that he had contacted three moving companies, none of which would take the job because some items were moldy. In an order issued in January 2014, the court extended the moving deadline by 21 days, but it denied the request to compel the Bank to pay for moving and storage. This order clarified that Trade Well was not required to pick up its personal property; it could also opt to abandon the property and then claim damages with respect to the abandoned property, subject to the Bank's defense of failure to mitigate. Trade Well chose the second option and left all of the personal property in the hotel.

This is where matters stood at the time the issues involved in this appeal arose. We take the facts from a declaration that Salem filed in March 2014 in response to an inquiry from the district court, as we do not understand anything material to be contested. On March 12, Salem went to the Register of Deeds in Sauk County, Wisconsin, intending to file a "Lis Pendence/Lien" on the hotel. The Register of Deeds is an elected county official; Wisconsin law provides that any plaintiff who brings "an action where relief is demanded affecting … real property which relief might confirm or change interests in the real property" must file a *lis pendens* "in the office of the register of deeds of each county where any part [of the real property] is situated." WIS. STAT. § 840.10(1)(a). Fixtures are classified as real property by Wis-

consin law. See *Wis. Dep't of Revenue v. A. O. Smith Harvestore Prods., Inc.*, 240 N.W.2d 357, 360–62 (Wis. 1976); *Premonstratensian Fathers v. Badgers Mut. Ins. Co.*, 175 N.W.2d 237, 239 n.1 (Wis. 1970). When a *lis pendens* is filed, "a subsequent purchaser or encumbrancer [is] bound by the proceedings in the action to the same extent and in the same manner as if a party thereto." *Belleville State Bank v. Steele*, 345 N.W.2d 405, 407 (Wis. 1984) (citing WIS. STAT. § 840.10(1)). The statute specifies that it applies to actions filed in all courts in Wisconsin, "including United States district courts." WIS. STAT. § 840.10(4).

The Register of Deeds, Brent Bailey, at first refused to accept Salem's filing, telling him that he needed a Wisconsin attorney to file the document. That advice was not accurate. In fact, the statute says only that a *lis pendens* that is prepared by a member of the State Bar of Wisconsin need not be authenticated. *Id.* § 840.10(1)(b). It does not prohibit filings submitted by others. They need only authenticate the document; this can be done by "[a]ny public officer entitled by virtue of his or her office to administer oaths, and any member in good standing of the State Bar of Wisconsin." *Id.* § 706.06(2). At the time, however, no one spotted the error. Salem responded instead by accurately informing Bailey that the district court had admitted him *pro hac vice*. With that information in hand, Bailey said that Salem could file the document himself so long as he had "a number from the Court identifying him." Not sure what number to use, Salem called the clerk of the district court, who told him that the only identifier for an attorney admitted *pro hac vice* is the date of admission and the attorney's name. Salem furnished that information to Bailey, who then accepted the paper.

The actual document Salem prepared, and Bailey filed, is entitled "Notice of Lien." It refers to the Wisconsin statute governing construction liens. See *id.* §§ 779.01, 779.06. The content of Salem's notice, however, more closely resembles a *lis pendens* under § 840.10 than a lien under § 779.06. As required by § 840.10(1)(a), Salem's Notice identifies the parties to the litigation, explains the purpose of the action (to recover "two million dollars in damages"), and describes the real estate affected. The stated purpose of his Notice—"to give notice to subsequent purchasers of this property, that the owner's right to sell the property to you may be limited by the pending action"—also suggests that in substance the Notice was a *lis pendens*. The Wisconsin Supreme Court has held that "the sole purpose of a lis pendens is to give constructive notice to third parties of pending judicial proceedings involving real estate." *Kensington Dev. Corp. v. Israel*, 419 N.W.2d 241, 245 (Wis. 1988). That device does not create or serve as a lien on real property. It is also notable that a construction lien must be filed with the clerk of the circuit court, not with the Register of Deeds. WIS. STAT. § 779.06(1).

The Bank's lawyer asked Salem to withdraw the Notice, but Salem refused. The Bank then asked the district court to strike the Notice, revoke Salem's *pro hac vice* admission, and assess costs and attorney's fees jointly against Trade Well and Salem for any amounts relating to the Notice. The Bank argued that it was about to close on its sale of the Hotel and asserted, without citing any legal authority, that the relief it requested was proper because "the Closing cannot occur without removal of the Notice of Lien from the Real Estate." The Notice was invalid, the Bank said, because it was either an improper claim for a construction lien, or it was a *lis pen-*

*dens* that was ineffective because it had neither been pre-
pared by a member of the Wisconsin Bar nor authenticated.

The district court took up the Bank's motion in a tele-
phone conference, during which it ordered Salem to file a
response to the Bank's motion and to show cause why he
"should not be held in contempt for filing the Notice without
any arguable right to do so." In response, Salem filed the
declaration we have been discussing. He explained that he
had recorded the document in order to protect Trade Well's
interests after he had learned that the Bank was on the brink
of being taken over by the Federal Deposit Insurance Corpo-
ration and was about to sell the Hotel at a below-market
price through an insider deal. He also maintained (consist-
ently with his position that this was a *lis pendens*) that there
was no basis for the Bank's contention that the Notice pre-
vented it from selling the Hotel to a willing buyer.

The district court was unmoved by Salem's explanation
and held him in contempt of court. It concluded that Trade
Well had no good-faith basis to seek a construction lien be-
cause it had offered no evidence that it furnished materials
or labor for improvements to the Hotel within six months of
filing the Notice, as required by Wisconsin Statutes
§ 779.06(1). Even if the Notice were construed as a *lis pen-
dens*, the court continued, the filing was unjustified because
the action involved "personal, rather than real, property."
The judge was also offended by Salem's invocation of his *pro
hac vice* status in connection with his filing of the Notice,
deeming it an "outrageous" abuse. Invoking its inherent au-
thority, the court revoked Salem's *pro hac vice* status, referred
him to the State Bars of Wisconsin and New York for disci-
plinary action, and fined him $500. Although the Bank had

not said anything about a counterclaim, the court granted "leave to file a counterclaim seeking a temporary restraining order, preliminary injunction, permanent injunction and damages related to the filing of the 'lien.'" Last, the court ordered Trade Well to retain new counsel within ten days and either to withdraw the Notice within seven days or "file a bond in the full amount of the sale price of the hotel."

Salem responded with a motion for reconsideration, in which he argued that he could not be held in contempt because he had not violated a court order. He also moved to file an appearance, explaining that he had become a "duly admitted attorney" in the court after the revocation of his *pro hac vice* status (he did not say how). The court denied the motion to reconsider, but in so doing it hedged on the nature of the $500 fine, which it now described as imposed pursuant to its inherent powers for conduct "far below" the standards it expected from attorneys appearing before it. The court did not withdraw the finding of contempt, or any of the sanctions that accompanied it. Instead, it clarified that the $500 was payable directly to the Bank. It then imposed additional sanctions against Salem, barring him from obtaining *pro hac vice* status in the district court for the next three years. The judge added that, to the extent that the fine needed to be based on a violation of a court order, he could identify two such violations: (1) Salem's failure to justify his filing of the Notice, and (2) his continuing to represent Trade Well in the litigation by filing two motions on the company's behalf and seeking full admission to the bar of the Western District of Wisconsin "by manipulating an unsuspecting deputy clerk."

Salem filed a notice of appeal within 30 days of these orders. Three months later, the Bank filed a counterclaim against Trade Well for slander of title; it sought damages, costs, attorney's fees, and a declaratory judgment that the Notice Salem had filed was void. Trade Well never hired new counsel, and so the Bank moved for default under Federal Rule of Civil Procedure 55(a). In response, Salem filed two briefs as an "interested party." In them, he explained that he is Trade Well's only authorized agent in the United States, and that the company had been trying to find new counsel. The judge struck Salem's briefs and fined him another $500, again payable to the Bank. Ultimately, the court held a hearing to determine the amount of damages and entered a default judgment for the Bank in the amount of $30,304.67. Final judgment in the case was entered on October 24, 2014.

## II

The only part of this messy case that is before us is Salem's appeal from the various measures the court took against him. He contends that they must be set aside, for the reason that the court had neither a legal nor a factual basis for its actions. The Bank argues that we lack appellate jurisdiction, because the contempt orders were not final and appealable at the time Salem filed his notice of appeal. We can dispose of the jurisdictional argument quickly. An adjudication of contempt is immediately appealable by a nonparty such as Salem. *United States v. Dowell*, 257 F.3d 694, 698 (7th Cir. 2001); *United States v. Myers*, 593 F.3d 338, 344 & n.9 (4th Cir. 2010). Furthermore, since the case is now over, our jurisdiction is also secure because a premature notice of appeal takes effect when the final judgment is entered. FED. R. APP.

P. 4(a)(2). The only part of Salem's case not before us is the propriety of the second $500 sanction imposed against him, because he did not amend his notice of appeal to include that. We are also not concerned with any possible appeal by Trade Well contesting the default judgment or the finding of a failure to prosecute.

On the merits, we begin by observing that it is unclear whether the district court meant to hold Salem in criminal contempt or civil contempt. See *Mañez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 589 (7th Cir. 2008) (describing different ways to characterize a fine imposed by a district judge). Salem splits it down the middle: he suggests that the $500 fine was under the civil contempt authority, but that the revocation of his *pro hac vice* status and the three-year bar on readmission are criminal contempt sanctions. He relies on the Supreme Court's decision in *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821 (1994), in which the Court explained that "a contempt sanction is considered civil if it is remedial, and for the benefit of the complainant," but criminal if it is punitive. *Id.* at 827–28 (internal quotation mark omitted). The sanctions relating to Salem's admission to practice do seem punitive, rather than coercive or compensatory. It is hard to pin down the $500 fine. Although it was initially imposed as part of the contempt order, the judge's statements in connection with the motion for reconsideration might imply that the fine was a penalty for misconduct that did not qualify as contempt.

For our purposes, the ultimate characterization does not matter, because the sanctions cannot stand no matter how they are classified. Salem was punished for out-of-court conduct, and so any alleged contempt was indirect. See *Bag-*

*well*, 512 U.S. at 827 n.2. If the court meant to invoke criminal contempt, the sanctions are improper because the judge neither gave Salem notice that he was being charged with criminal contempt, nor asked the government to prosecute the contempt. See 18 U.S.C. § 401; FED. R. CRIM. P. 42(a); see also *United States v. Britton,* 731 F.3d 745, 749–50 (7th Cir. 2013).

The order is no better, understood as a civil contempt measure. Before holding a person in civil contempt, a district court "must be able to point to a decree from the court which sets forth in specific detail an unequivocal command which the party in contempt violated." *Mañez,* 533 F.3d at 591 (quoting *Grove Fresh Distribs., Inc. v. John Labatt, Ltd.,* 299 F.3d 635, 642 (7th Cir. 2002)) (internal quotation marks omitted); see also *Hornbeck Offshore Servs., L.L.C. v. Salazar,* 713 F.3d 787, 792 (5th Cir. 2013); *John T. ex rel. Paul T. v. Del. Cnty. Intermediate Unit,* 318 F.3d 545, 552 (3d Cir. 2003). The problem is not that the district judge failed to point to the particular order or orders that Salem violated when he filed the Notice; it is that no such order exists.

The Bank suggests that the district court did not hold Salem in contempt, but rather imposed sanctions under its inherent power to correct abuse of proceedings. The Supreme Court, however, has cautioned that the use of inherent powers should be "exercised with restraint and discretion." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991); see also *Law v. Siegel,* 134 S. Ct. 1188, 1194 (2014) ("Courts' inherent sanctioning powers are … subordinate to valid statutory directives and prohibitions."). At a minimum, the court must be sure of both the factual and legal basis on which it is acting. Here, the record reveals misunderstandings on both fronts. The judge sanctioned Salem "for filing the Notice without

any arguable right to do so." That conclusion rested principally on the proposition that Trade Well had claimed an entitlement only to personal property, not to real property. But Trade Well's claim was not so limited. Its original complaint, supplemented by the attached inventory, covered both fixtures and personal property. Fixtures, as we already have noted, are considered to be real property under Wisconsin law. And even if the character of the leased items Trade Well was trying to protect was not obvious at the outset, all ambiguities were cleared up after it claimed an entitlement to fixtures in its amended complaint. The district court recognized as much in its earlier order setting a deadline for Trade Well to remove its personal property; that order specified that, unlike the personal property, the Jacuzzis and "remodeling" were to remain in the Hotel.

Moreover, even though the judge correctly noted that Trade Well could not file a claim for a construction lien because it would be untimely, see WIS. STAT. § 779.06(1), he went too far when he opined that "no construction is involved in this case." To the contrary, the record indicates that Trade Well had done some remodeling in the Hotel. A construction lien may be obtained by any person who "furnishes … materials … used or consumed for the improvement of land." *Id.* § 779.01(3). The term "materials" includes, among other things, "construction materials" and "fixtures." *Id.* § 779.01(2)(bm). The court did not explain why none of the items Trade Well had provided fit that definition.

The court's central mistake, however, was its conclusion that Trade Well had no basis for filing a *lis pendens*. That is what the Notice most closely resembled, and because the underlying litigation between Trade Well and the Bank in-

volved real property (in the form of fixtures), Trade Well was compelled by statute to file its notice in the office of the Register of Deeds. *Id.* § 840.10(1)(a). The references in Salem's Notice to the statute on construction liens and its use of the word "lien" are, at best, evidence of a mistake or maybe carelessness on Salem's part. Negligence, however, is not enough to support a finding of bad faith. See *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013); *Maynard v. Nygren*, 332 F.3d 462, 471 (7th Cir. 2003). And sanctions under the court's inherent power should not be imposed unless there is bad-faith conduct or willful disobedience of an order. *Grochocinski*, 719 F.3d at 799. Neither is present here.

Both the judge and the Bank realized that Salem's Notice was most likely a poorly drafted or hasty *lis pendens*. That is why the judge asserted that Salem had "abused … his *pro hac vice* privileges" by filing the Notice as a non-member of the Wisconsin Bar and without proper authentication. Once again, however, this record does not support a finding of the necessary bad faith to support sanctions. It is not even clear to us that the court's understanding of Wisconsin law was correct. Salem was candid with the Register of Deeds of Sauk County, and the Register was the elected official responsible for these filings. Neither the court nor the Bank has cited any authority, nor can we find any, supporting the proposition that the Register lacked the discretion to accept Salem's Notice, along with the identifying information Salem furnished. (Salem represents that he also volunteered to find a local lawyer, if that was necessary, but he was told that he did not need to do so.) In addressing Salem's motion for reconsideration, the court stated that Salem had "disingenuously" attempted to blame his problems on the Sauk County Register,

but it did not explain why Salem's account was disingenuous. No one has ever accused Salem of lying about what took place. It is possible that the Register did not understand his own authority, but it is hard to see how that translates into misconduct by Salem. Nothing indicates that Salem's reliance on the Register's advice was in bad faith.

Finally, the court's stated reason for the first $500 fine strikes us as inadequate to justify that measure. As we have explained, Salem's filing of the Notice was justified, and so the fine cannot be based on the notion that it was not. Alternatively, the court tried to justify the fine on the basis of the papers Salem lodged with the court after his *pro hac vice* status was revoked. But those actions could not justify the fine, because it was imposed while Salem was still permitted to appear in the case and before he filed those later motions.

### III

Salem probably made mistakes in this case that a member of the Wisconsin Bar would have avoided, but his conduct did not justify the measures that the district court took against him. We therefore VACATE the orders before us holding Salem in contempt and imposing sanctions.