NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

No. 11-3252 Argued June 5, 2012
No. 12-2694 Submitted January 2, 2013[*]
Decided January 17, 2014

**Before**

WILLIAM J. BAUER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

| | | |
|---|---|---|
| EDGAR TATE, | ) | Appeals from the United States District |
|     *Plaintiff-Appellant,* | ) | Court for the Southern District of Illinois. |
| | ) | |
| No. 11-3252   *v.* | ) | No. 3:08-cv-00200-DRH-DGW |
| | ) | |
| JO GULLEY ANCELL, *et al.,* | ) | David R. Herndon, |
|     *Defendants-Appellees.* | ) | *Chief Judge.* |

| | |
|---|---|
| | ) |
| EDGAR TATE, | ) |
|     *Plaintiff,* | ) |
| | ) |
| No. 12-2694   *v.* | ) |
| | ) |
| ADDUS HEALTHCARE, INC., *et al.,* | ) |

---

[*] After examining the briefs and the record, we have unanimously concluded that oral argument is unnecessary to the resolution of Appeal No. 12-2694, which we deem to be successive to Appeal No. 11-3252. *See* 7th Cir. Internal Operating Proc. 6(b). Appeal No. 12-2694 is therefore submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

*Defendants-Appellees.*                    )
                                           )
APPEAL OF: RICHARD S. FEDDER         )

**O R D E R**

Edgar Tate sued the state agency for which he works along with one of the agency's private contractors, asserting that they joined forces in a conspiracy (thus far unsuccessful) to oust him from his job after he supported a coworker's charge of sexual harassment. He alleges that in furtherance of this conspiracy, the defendants subjected him to a series of disciplinary measures that constituted discrimination on the basis of his sleep disorder, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, *et seq.* (the "ADA"), discrimination based on his national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII), and retaliation for having opposed workplace sexual harassment, also in violation of Tile VII, § 2000e-3(a), as well as 42 U.S.C. §§ 1981 and 1983. The district court granted summary judgment in the defendants' favor on these and other claims not at issue in this appeal. In Appeal No. 11-3252, Tate contends that the district court overlooked evidence that supports his conspiracy theory and indicates that the defendants indeed did discriminate against him in a variety of ways. We disagree and affirm the district court's summary judgment ruling. Separately, in Appeal No. 12-2694, Tate's lawyer, Richard Fedder, has appealed the sanctions that the district court imposed against him pursuant to 28 U.S.C. § 1927 for unreasonably pursuing claims against Addus Healthcare, Inc. ("Addus"). Addus was the private contractor whose employees Tate alleges conspired with his employer to assemble a disciplinary record that would result in his dismissal; two of those employees are named as defendants in addition to Addus. We agree with the district court, however, that Tate's claims against Addus and its employees were frivolous. We therefore affirm the district court's order requiring Fedder to pay the Addus defendants' costs and fees.

**I.**

Tate has worked as a rehabilitation counselor at the Department of Human Services ("DHS"), Division of Rehabilitation Services ("DRS"), a public agency of the State of Illinois, since February of 1994. Tate is an Hispanic, Cuban-born male; he also suffers from sleep apnea. Tate alleges that after he lent his support to a coworker's sexual harassment complaint in 2003, DRS in 2006 and 2007 targeted him with a series of discriminatory disciplinary actions and conspired with its contractor, Addus, to build a case for Tate's eventual termination based on these disciplinary measures.

Tate's second amended complaint named as defendants DHS, along with current and

former DRS and DHS employees Jo Gulley Ancell, Jeff Standerfer, Al Farmer, and Eugene Davis, whom we shall refer to collectively as the "State defendants." Tate also named as defendants Addus, along with Addus employees Lorie Humphrey and Kim Evans, whom we shall refer to collectively as the "Addus defendants." As relevant to these appeals, Tate alleged that (1) DHS violated the ADA by failing to reasonably accommodate his sleep apnea and otherwise discriminating against him based on that condition; (2) DHS violated Title VII by creating a hostile work environment and otherwise discriminating against him because of his national origin and by retaliating against him for opposing the sexual harassment of a coworker; and (3) the individual State defendants and the Addus defendants violated the equal protection clause of the Fourteenth Amendment (enforced via section 1983) and section 1981 by creating a hostile work environment and otherwise discriminating against him because of his national origin, as well as by retaliating against him for having opposed the sexual harassment of a coworker.

Tate began working for DRS as a trainee in February 1994 and is presently employed as a senior rehabilitation counselor at the Anna office of DRS in southern Illinois. DRS is a public agency of the State of Illinois which provides vocational, rehabilitation, and home services to eligible persons with disabilities. Co-defendant Addus, a private agency, contracted with DRS to provide office support personnel and Licensed Practical Nurses ("LPNs") for the DRS offices in Carbondale and Anna, Illinois.

In November or December of 2003, Veronica Green, Tate's rehabilitation case coordinator, complained that Al Farmer, Tate's supervisor at the time, had sexually harassed her. With Tate's assistance, Vicky Tuttle, another DRS employee, prepared an internal, third-party sexual harassment charge reporting Farmer's sexual harassment of Green. The charge was submitted to Farmer's supervisor, Jerry Jimenez, who passed it on to the DHS administration. During the investigation of the charge, Farmer was removed from his supervisory position, and the Anna office allegedly split into two factions—those supporting Farmer and those supporting Tate and his associates. Tate never spoke with Farmer about the charge.

Tate maintains that because of his support for the sexual harassment charge, certain of his colleagues at both DRS and Addus implemented a campaign to harass him and ultimately to have him terminated. Although he is still working for DRS, he alleges that various actions taken against him, including a number of suspensions imposed in 2006 and 2007 demonstrate retaliation and discrimination based on national origin and/or disability. His theory that the sexual harassment charge against Farmer spawned a concerted effort to penalize and ultimately get rid of him is based in large part on a May 2004 email that Farmer sent to Jeff Standerfer, the DHS assistant bureau chief for southern Illinois, in which Farmer discussed an email from Green which mentioned the sexual harassment charge. In

the email, Farmer wrote that "Veronica Green's name is on the E-mail, but the words are Edgar Tate's." He described Tate as a "destructive" force in the Anna office who was manipulating Green and suggested that Standerfer "break up that destructive Home Service Cli[que] that is responsible for the majority of the problems in the Anna Office." R. 103-24. Tate sees this document as direct evidence that Standerfer and Farmer wanted revenge for Tate's support of the sexual harassment charge and became allies in a greater plan to purge Tate and his supporters from DRS's Anna office.

Late in 2004, Farmer retired from DRS; and in January 2005, defendant Ancell, who had been in charge of DRS's Carbondale office for a year, was directed by Standerfer to assume oversight of the Anna office as well, thereby replacing Farmer as Tate's supervisor. Ancell was the proponent of a series of disciplinary measures that were subsequently taken against Tate for purported work rule infractions. Tate views these disciplinary measures as acts in furtherance of the alleged scheme to punish and ultimately oust him from the office.

On or about March 8, 2006, Tate received an oral reprimand after he telephoned a client to discuss an issue rather than contacting the client in writing as he had been directed by Ancell.

In January of 2007, Ancell suspended Tate for three additional infractions that had taken place later in 2006. First, in September 2006, Tate failed to provide a written "Summary of Evidence" (setting forth the reasons why DRS had taken the adverse action being appealed by a client) to a hearing officer three working days in advance of a scheduled appeal hearing, as required by Illinois administrative code section 510.105(d) and as directed by Ancell. (Tate instead had mailed the statement three days prior to the hearing, so that the hearing officer did not receive it until the day of the hearing.) Tate had also failed to appear telephonically and represent DRS at that hearing, and this failure to appear resulted in a default ruling forcing the agency to provided thousands of dollars' worth of services to a client DRS had determined to be ineligible for those services. Second, on November 15, 2006, while the decision over whether and how to discipline Tate for this incident was still pending, Tate failed to submit a Summary of Evidence for another appeal hearing. The client in that case agreed to continue the hearing, sparing DRS another default judgment. Third, on November 13, Ancell instructed Tate to collaborate with a coworker to prepare a Summary of Evidence for yet another appeal hearing. Tate failed to meet with the coworker as planned and later gave Ancell a one-page narrative omitting the nine pages of facts that the coworker had prepared and faxed to him.

As a result of these incidents, Ancell charged Tate with the failure to follow supervisory instructions and negligence in performing his job duties. Ancell recommended that Tate

be suspended for five days, which recommendation was approved by both her supervisor and Laurie Tappenbeck of the DHS Bureau of Labor Relations. As a result of a union grievance, Tate was instead suspended for two days.

Tate was again suspended after he twice fell asleep during mandatory training sessions in February of 2007. (On both occasions, Tate was snoring and had to be nudged awake.) He was subsequently charged with violating a provision of the DHS employee handbook which proscribed sleeping while on duty. At the hearing on this charge, multiple written witness statements were presented confirming that Tate was sleeping during the training sessions, and Tate himself admitted that he had been "inattentive." R. 91-4 at 13. However, Tate averred that his inattentiveness was the result of both his sleep apnea and a new anti-depressant medication that he was taking. Based on the evidence and after a series of discussions with Labor Relations and senior management, Ancell proposed to Standerfer that Tate be suspended for fifteen days. Tappenbeck approved the proposed suspension, which Tate served in late May and early June.

In August 2007, Tate was again suspended after he failed to submit another Summary of Evidence three working days prior to a scheduled hearing in mid-May. With Tappenbeck's approval, Ancell ordered that Tate be suspended for a period of five days.

Tate attributes the above discipline in part to Addus contract workers who, he alleges, conspired with DRS defendants to spy on him, make false misconduct charges against him, and to create a hostile work environment based on his national origin, disability, and/or in retaliation for having supported the 2003 sexual harassment charge. More particularly, Tate alleges that defendant Humphrey, an Addus employee, asked to work closely with Tate so that she could spy on him. Tate notes that Humphrey was involved in some of the incidents giving rise to the disciplinary measures and that her account of events comprised a portion of the evidentiary basis for the suspensions that DRS imposed on him for those incidents. He also cites testimony from Humphrey's ex-husband and her son that on one occasion in 2008, Humphrey, referring to Tate, stated: "He's not going to be around much longer. We're making sure of that." Then she added: "He's done some bad things and he's going to pay for it. He's not going to be employed there much longer." R. 103-4 at 1 ¶¶ 8-9; R. 103-3 at 1-2 ¶¶ 9-10. Tate trumpets Humphrey's statement as proof that she was somehow privy to and part of Ancell's supposed plan to fire Tate.

The District Court granted summary judgment in favor of all the defendants. *Tate v. Ancell*, 2011 WL 3859913 (S.D. Ill. Sept. 1, 2011). With respect to the ADA claim, the court noted that Tate had not shown that his sleep apnea substantially limited one or more of his major life activities; that, prior to his suspension for sleeping at work, he had only disclosed the condition to his previous supervisor and had not requested an accommodation; and that he had been disciplined not on the basis of his condition but for sleeping on the job,

an infraction for which at least ten other DRS employees had been disciplined similarly. *Id.*, at *5-*6.

As for Tate's claims of national origin discrimination, the court noted first that in view of the statutes of limitations applicable to the Title VII and section 1983 claims, any discrete acts of discrimination that took place prior to October 4, 2006, and March 13, 2006, respectively, were beyond the temporal scope of these claims. *Id.*, at *6. The court went on to note that Tate had no direct evidence that the defendants harbored any animus against Tate based on his national origin (or race). *Id.*, at *8. Nor had Tate succeeded in demonstrating national origin discrimination indirectly, via the *McDonnell-Douglas* framework: the evidence indicated that Tate was not meeting his employer's legitimate expectations, and Tate had failed to identify similarly-situated employees who were treated more leniently than he was. *Id.*, at *8-*9; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 1824-26 (1973). Finally, there was no evidence that the Addus defendants had taken any adverse employment action against Tate. *Id.*, at *10.

The court likewise found no proof, direct or indirect, supporting an inference that the defendants had conspired to retaliate against Tate for the support he had given to his coworker's claim of sexual harassment. When Tate was asked about this subject at his deposition, he had repeatedly disclaimed any knowledge of when, where, and how the conspiracy had formed or if the defendants had communicated about the alleged plan to punish him. *Id.*, at *10. Furthermore, Tate was unable to establish any causal connection between his support for the sexual harassment claim in 2003-04 and the disciplinary actions taken against him in 2006 and 2007. *Id.*, at *10. (The court presumably rejected Farmer's 2004 email to Standerfer as sufficient to connect the two sets of events.) Tate's retaliation claim under section 1981 failed for want of any evidence that the claim had anything to do with race. *Id.*, at *11. Last, the court found no evidence suggesting that Tate was harassed, and thus subject to a hostile work environment, based on a protected ground: Tate had never argued that he was subjected to sexual harassment, for example, and there was no indication that he was harassed based on his national origin (no proof, for example, that he was treated less favorably than individuals of different ethnicities). *Id.*, at *12. The court did not expressly consider whether Tate might have a viable claim for having been subject to a hostile environment in retaliation for having opposed Farmer's alleged harassment of Green in 2003-2004. We presume, however, that the court rejected that possibility (or would have done so) based on its finding that there was no evidence connecting the events of 2003 and 2004 with the adverse employment actions taken against Tate in 2006 and 2007. *See id.*, at *10.

## II.

Our review of the district court's summary judgment decision is de novo. *E.g., Swetlik*

*v. Crawford*, 2013 WL 6731780, at *6 (7th Cir. Dec. 23, 2013). We take the evidence in the light most favorable to Tate and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S. Ct. 1598, 1609 (1970)); *Perez v. Thorntons, Inc.*, 731 F.3d 699, 703 (7th Cir. 2013). If the evidence, so viewed, presents a genuine issue of material fact, then Tate is entitled to a trial. *See id.* at 703, 704-05. However, if the evidence is merely colorable or not significantly probative, *Liberty Lobby*, 477 U.S. at 249-50, 106 S. Ct. at 2511, or raises no more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986), summary judgment is appropriate. Employment discrimination cases typically turn on an employer's motive and intent in taking adverse action against the plaintiff—things that a plaintiff can rarely prove directly. Courts must have this in mind as they entertain an employer's motion for summary judgment. *See Courtney v. Biosound, Inc.*, 42 F.3d 414, 423 (7th Cir. 1994) (collecting cases). *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). Even so, there is no special summary judgment rule for such cases. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013). If the plaintiff is unable to identify evidence sufficient to create a genuine issue of fact as to whether the employer was motivated by an illegitimate reason in taking adverse action against the plaintiff, and/or to cast doubt on the employer's stated, non-discriminatory reason for that action, then summary judgment will be proper. *See Meister v. Georgia-Pacific Corp.*, 43 F.3d 1154, 1159 (7th Cir. 1995); *McMillian*, 878 F.2d at 188-89; *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 411-12 (7th Cir.1988).

We begin by noting that Tate has devoted just six pages of his 46-page opening brief to a legal analysis of the merits of his case. He cites only three cases in the entire brief, one of them for the standard of review. And he largely fails in that brief to make a coherent legal argument as to why the district court erred in granting summary judgment against him. His oversized reply brief is arguably more complete in these respects. The reply brief, however, is not the place for an appellant to make or develop arguments for the first time. *E.g.*, *Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 658 (7th Cir. 2009); *United States v. Alhalabi*, 443 F.3d 605, 611 (7th Cir. 2006); *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005). Giving Tate every benefit of the doubt, we proceed to address the points that we believe he has at least minimally preserved in the briefs.

A. ADA Claim

Tate's ADA claim primarily rests on his contention that his employer improperly disciplined him based on manifestations of his sleep apnea, which Tate argues is a disability for purposes of the ADA. In a disparate treatment claim of this sort, a plaintiff must show that he is (1) protected under the ADA as an individual with a disability who is qualified in the sense that he can perform his job with or without accommodation, and

(2) that his employer violated the ADA by taking adverse action against him (3) because of his disability. *E.g.*, *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006).

The threshold question is thus whether Tate is an individual with a disability as that term is used in the ADA. A plaintiff can satisfy that requirement by showing that: (1) he has a physical or mental impairment that substantially limits one or more major life activities; (2) he has a record of such an impairment; or (3) he is regarded as having such an impairment by his employer. 42 U.S.C. § 12102(2); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 478, 119 S. Ct. 2139, 2144 (1999).

The district court viewed the evidence as insufficient to establish that Tate's sleep apnea qualified as a disability in the sense that it substantially limited a major life activity. Insofar as sleeping is the pertinent life activity, the court reasoned that Tate's inability to sleep for more than four hours per night by itself was not sufficient to trigger protection under the statute. 2011 WL 3859913, at *5; *see Feldman v. Olin Corp.*, 692 F.3d 748, 753 (7th Cir. 2012), and *Scheerer v. Potter*, 443 F.3d 916, 919-20 (7th Cir. 2006) (both citing sleep as an example of a major life activity); *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784 & n.6 (7th Cir. 2007) (holding that one's inability to get more than three to four hours of sleep per night is insufficient to establish that plaintiff is disabled, absent additional evidence that the condition is severe or long-term, or that lack of sleep interfered with plaintiff's daytime activities). Tate has given us no reason to question this aspect of the district court's ruling or to revisit the cases that the district court relied on.

The possibility that Tate's sleep apnea was the reason why he fell asleep at the workplace training sessions—resulting in his suspension—suggests that his condition may substantially interfere with his waking activities. *See, e.g.*, *Squibb*, 497 F.3d at 784. In particular, Tate may have an argument that his sleep apnea imposes a substantial limit on the major life activity of working by making it difficult for him to consistently remain alert while on duty. *See, e.g.*, *Brown v. City of Salem*, 2007 WL 671336, at *4 (D. Ore. 2007).

Recognizing that Tate's sleep apnea substantially limits his ability to work would take the court to the next issue, which is whether Tate's employer took adverse action against him because of his disability. As the district court recognized, this court has drawn a distinction between an employee's disability and workplace misconduct resulting from that disability. *See Bodenstab*, 569 F.3d at 659; *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 395 n.5 (7th Cir. 2000). We have therefore reasoned that an employee's disability will not preclude an employer from imposing discipline, up to and including discharge, for the employee's violation of a workplace rule, even when there is a connection between the disability and the violation. *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001); *see also Budde v. Kane Cnty. Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010); *Bodenstab*, 569 F.3d at 659; *Waggoner v. Olin Corp.*, 169 F.3d 481, 484, (7th Cir. 1999). And in this case, as the

district court pointed out, the evidence—including proof that ten other DHS employees were suspended for fifteen-day periods for sleeping on the job, and two were terminated after a second violation, *see* 2011 WL 3859913, at *6—indicates that DRS indeed did discipline Tate because of his workplace misconduct rather than because of his disability. *But see Spurling v. C & M Fine Pack, Inc.*, 2014 WL 107968, at *5 (7th Cir. Jan. 13, 2014) (summary judgment improperly granted on plaintiff's failure-to-accommodate claim, where evidence indicated that plaintiff's history of decreased consciousness and alertness at work was due to narcolepsy, plaintiff had informed employer of her condition before she was terminated, and yet employer never engaged in interactive effort to accommodate her).

Not all courts have drawn the same distinction that we have between an employee's disability and workplace misconduct that results from the disability. *See, e.g., Dark v. Curry Cnty.*, 451 F.3d 1078, 1084 (9th Cir. 2006) ("[W]ith few exceptions, conduct resulting from a disability is considered part of the disability, rather than a separate basis for termination.") (quoting *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001)). We have thus far rejected invitations to abandon the distinction. *See, e.g., Spath*, 211 F.3d at 395 n.5 ("In essence, Spath is asking this Court to extend the ADA so as to prevent an employer from terminating an employee who lies, just because the lying is allegedly connected to a disability. We are of the opinion that the ADA does not require this.") (citing *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999) ("The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability.") (collecting cases)); *but see Spurling*, 2014 WL 107968, at *5.

But whatever argument Tate might make urging us to limit or reconsider precedents such as *Spath* has been waived. Although Tate's original complaint alluded to the theory that his sleep apnea impacted the major life activity of working, his subsequent complaints omitted mention of this theory, and more importantly, he never raised it in opposing the State defendants' motion for summary judgment. *See, e.g., Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 509 (7th Cir. 2013) (arguments not made to district court are waived). Tate argued below only that his sleep apnea limited his ability to sleep; and that argument failed for the reasons that the district court articulated.

In addition to his claim of disparate treatment, Tate has also contended that DRS failed to reasonably accommodate his sleep apnea in ways that would have enabled him to perform his job responsibilities without incident. Tate points out that he raised his condition during the disciplinary proceeding that took place after he was observed asleep at the training sessions and expressly asked for accommodations.

The accommodation claim faces at least two problems. First, before he can claim an entitlement to an accommodation, Tate must show that he is a qualified individual with

a disability. *E.g.*, *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). He has not shown this, for the reasons we have already discussed. Second, it is not clear why Tate's after-the-fact request for an accommodation would have precluded DRS from disciplining him for having previously fallen asleep during training. We may assume that the request would have imposed an obligation on DRS going forward to explore the possibility of an accommodation that would have helped Tate to avoid falling asleep at work in the future; indeed, our recent decision in *Spurling* holds as much. 2014 WL 107968, at *5. But prior to the training incidents, Tate had not asked for an accommodation. And when he finally did ask for one after he was charged with sleeping on the job, the measures he suggested were granted by DRS—including providing him with a driver to take him to client appointments outside of the office. Having not previously asked for an accommodation that might have averted the sleeping incidents, Tate cannot complain of discipline which, as the record indicates, was imposed on other employees who slept on the job. In short, Tate has not shown that DRS breached any duty to accommodate him prior to the occasions on which he violated work rules by falling asleep; and the request for accommodation that Tate made during the ensuing disciplinary proceeding would not have compelled DRS to ignore the infraction he had already committed.

B. National Origin and Retaliation Claim

Tate also challenges the district court's conclusion that the record did not support an inference that the defendants discriminated against him based on his national origin and/or in retaliation for having opposed sexual harassment in the workplace. A plaintiff may establish either form of discrimination using the "direct" or "indirect" method of proof. *See*, *e.g.*, *Brown v. Ill. Dep't of Natural Resources*, 499 F.3d 675, 681 (7th Cir. 2007); *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). As we have recognized, the direct method of proof does not require evidence akin to an admission of discriminatory intent; one may also establish the proscribed intent with strong circumstantial evidence that also bespeaks discrimination but through a longer chain of inferences. *See Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297-98 (7th Cir. 2010); *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 641 (7th Cir. 2008); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). The indirect method follows the *McDonnell-Douglas* model, and raises an inference of discrimination by means of proof, *inter alia*, that similarly situated employees were treated more favorably than the plaintiff. *See generally McDonnell Douglas Corp. v. Green*, *supra*, 411 U.S. at 802-05, 93 S. Ct. at 1824-26; *see also*, *e.g.*, *Faas*, 532 F.3d at 641-42; *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009).

We begin by noting that although Tate has alleged that he was discriminated against based on his national origin, he points to no evidence indicating that his status as a Cuban-born Hispanic informed any of the disciplinary actions taken against him. He asserts that

Farmer viewed himself as the victim of a "Hispanic conspiracy" of which Tate was an active member (along with Jimenez, Farmer's supervisor). Accepting that assertion as true, Farmer's perception does not, without more, support a finding that Tate was the victim of actionable discrimination. Nothing in the record suggests, directly or indirectly, that Tate's national origin had any bearing on the actions that DRS took against him. What proof Tate does identify speaks only to his retaliation claim.

In support of that claim, Tate attempts to establish retaliation directly by means of "a convincing mosaic of circumstantial evidence" that would permit a jury to infer that the defendants retaliated against him for having supported the sexual harassment charge involving Green. *See, e.g., Davis v. Time Warner Cable of Se. Wisconsin, L.P.*, 651 F.3d 664, 672 (7th Cir. 2011). Tate's mosaic theory consists of statements made by various employees coupled with adverse actions that, in his view, evidence a long-running conspiracy initiated by Farmer and executed by his successor, Ancell, with the end goal of getting rid of Tate. Two statements feature prominently in the mosaic Tate has assembled. First, he points to the May 2004 email sent by Farmer to Standerfer, in which Farmer complained that Tate was manipulating Green, described Tate as a "destructive" force in the office, and suggested that Standerfer "break up that destructive Home Service Click [sic] that is responsible for the majority of the problems in the Anna Office." R. 103-24. Secondly, Tate relies on Addus employee Humphrey's remark to her family in 2008 that "[w]e're making sure" that Tate was "not going to be around much longer," and that Tate had "done some bad things and he's going to pay for it." R. 103-4 at 1 ¶¶ 8-9; R. 103-3 at 1-2 ¶¶ 9-10. Tate's theory is that these statements, coupled with the disciplinary actions taken against him in 2006 and 2007, show that Farmer initiated a plan to get rid of Tate that Ancell later began to implement with the help of Addus employees like Humphrey.

These statements, we agree, have the ring of retaliation to them, but the problem for Tate is that there is no evidence linking them to the disciplinary actions of which he complains. Farmer's statement, purportedly marking the origin of the plot, was made in 2004, years before the 2006 and 2007 suspensions that underlie the timely aspects of Tate's complaint. Tate does not explain why Farmer's email supports an inference that DRS was out to get him, given that Farmer retired in 2004 and Tate came under the supervision of someone from outside the Anna office—Ancell—in 2005. Even if it is plausible to suppose that the alleged conspirators were patient (and clever) enough to wait for more than two years to begin the alleged retaliatory campaign, Tate cites no evidence that bridges both the change in personnel and the passage of time and supports an inference that the discipline imposed in 2006 and 2007 was in retaliation for what Tate did to support the sexual harassment claim in 2003 and 2004. Humphrey's statement is potentially more probative in the sense that it was made somewhat more close in time to the disciplinary acts of which Tate complains. But Tate has no evidence connecting Humphrey's statement to Farmer's

statement or to the sexual harassment charge—i.e., that the "bad things" Humphrey said Tate was going to "pay for" included Tate's support for the 2004 charge against Farmer. Indeed, Humphrey's statement was made after Tate filed this suit,[1] and for all we know, her remarks were focused on the litigation rather than his support for Green and the sexual harassment charge; and Tate has not asserted a retaliation claim based on the filing of this suit. Moreover, Humphrey, an employee of Addus rather than DRS, was not responsible for any personnel decisions at DRS and had no authority over Tate. Given Humphrey's absence from Tate's chain of command, her statement is of a piece with the kinds of "stray remarks" of non-decisionmakers that we routinely discount as proof of an employer's alleged animus. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S. Ct. 1775, 1804-05 (1989) (O'Connor, J., concurring); *Egonmwan v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010); *Mlynczak v. Bodman*, 442 F.3d 1050, 1057-58 (7th Cir. 2006); *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998). In short, there is no mosaic here that suggests a long-running scheme to punish Tate for having opposed sexual harassment in his workplace. If Tate has a case of retaliation, it is one that must rely on the indirect method of proof.

As we have noted, one showing required by the *McDonnell Douglas* framework is proof that other employees situated similarly to the plaintiff were treated more favorably than he was. In determining whether two employees are similarly situated, a court must look at all relevant factors, the number of which depends on the context of the case. *E.g.*, *Spath v. Hayes Wheels Int'l-Ind.*, *supra*, 211 F.3d at 397. In a case like this one, in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason—a plaintiff must show that he is similarly situated with the other employee vis-à-vis his performance, qualifications, conduct, and supervisor. *E.g.*, *Johnson v. Holder*, 700 F.3d 979, 982-83 (7th Cir. 2012).

Tate's comparators are riddled with distinguishing characteristics. Tate cites both Farmer and Tony Jones (who worked at the Carbondale DRS office) as appropriate for comparison, but neither had the same supervisor as Tate (Farmer was *Tate*'s supervisor) nor a comparable job title or set of work responsibilities. Their misconduct is also dissimilar to Tate's: Jones, for example, downloaded a number of songs onto his work computer's hard drive, causing it to "crash." Tate also proffers Steve Bracewell, a counselor at the Carbondale office, who like Tate was accused of sleeping on the job but was not suspended. The problem for Tate is that the accusations against Bracewell were never substantiated; for that obvious reason, Bracewell was not similarly situated with Tate,

---

[1] The affidavits attributing this statement to Humphrey indicate that she made the remark late in the Summer of 2008. R. 103-3 at 1 ¶ 4; R. 103-4 at 1 ¶ 4. Tate had filed this suit several months earlier, in March 2008.

against whom the accusations of sleeping were amply proven. Finally, Tate suggests that Humphrey and Kohler, both of whom were LPNs employed by Addus (and who had worked with him on projects and reports for which he was disciplined), engaged in misconduct similar to his but were not disciplined. But these individuals were contract employees with wholly distinct positions and a different employer than Tate. Tate gives us no reason to ignore these critical differences, and as a result we agree with the district court that Tate did not meet his burden under the *McDonnell Douglas* burden-shifting test to identify similarly situated employees who were treated more favorably than he was.

For all of the foregoing reasons, the district court correctly granted summary judgment in favor of the defendants.

**III**.

In Appeal No. 12-2694, Tate's counsel, Richard Fedder, appeals the district court's ruling directing him to reimburse the Addus defendants for the $92,226.17 in costs and fees they incurred defending Tate's suit against them. The court imposed that obligation pursuant to 28 U.S.C. § 1927. Fedder contends that the district court held him liable for the Addus defendants' costs and fees without notice and without an opportunity to respond, that his conduct in prosecuting the claims against the Addus defendants did not warrant sanctions under section 1927, and that the court erred in holding him liable for all of the Addus defendants' fees. Because the procedural history of the fee award has some bearing on Fedder's appeal, we shall set out the highlights of that history before reaching the merits of his arguments.

After the district court granted summary judgment to all defendants, the Addus defendants filed a motion seeking an award of costs, including attorneys' fees, pursuant to 42 U.S.C. §§ 1988(b), 2000e-5(k), and 12205, asserting that Tate's claims against them were meritless and that because they had prevailed in the litigation, they were entitled to their fees. *See Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 675 (7th Cir. 2005) (under section 1988, prevailing defendant entitled to fees only when plaintiff's suit was "frivolous, unreasonable, or groundless") (citing, *inter alia*, *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421, 98 S. Ct. 694, 700 (1978) (§ 2000e-5(k)), and *Hughes v. Rowe*, 449 U.S. 5, 14-15, 101 S. Ct. 173, 178-79 (1980) (§ 1988)); *Maynard v. Nygren*, 332 F.3d 462, 471 (7th Cir. 2003) (§ 12205). During the over four months that the motion was pending before the court, Tate never filed a response. Ultimately, the court granted the motion on the authority of section 1988(b), reasoning that "the[ ] claims against the Addus defendants were frivolous and pursued without any factual or legal basis." *Tate v. Ancell*, 2012 WL 462958, at *2 (S.D. Ill. Feb. 13, 2012). The court directed the Addus defendants to file a petition setting forth the costs and fees they had reasonably incurred in the litigation. Because section 1988 does not authorize the court to place the obligation to pay such an award on

the plaintiff's counsel, Tate rather than Fedder would have borne the liability for the award. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 761, 100 S. Ct. 2455, 2461 (1980); *Hamer v. Cnty. of Lake*, 819 F.2d 1362, 1370 (7th Cir. 1987); *see also Corneveaux v. CUNA Mut. Ins. Grp.*, 76 F.3d 1498, 1508-09 (10th Cir. 1996) (collecting cases re. sections 1988 and 2000e-5(k)).

Tate subsequently filed a motion asking the court to reconsider its ruling, arguing principally that his claims against the Addus defendants were not frivolous. R. 134. The Addus defendants filed a memorandum opposing the motion. R. 138. Tate, in turn, filed a reply in support. R. 141. The court denied the motion in a written opinion. *Tate v. Ancell*, 2012 WL 1854888 (S.D. Ill. May 21, 2012).

In the meantime, the Addus defendants submitted their fee petition, which sought reimbursement for all of the fees they had incurred over the life of the case. R. 135. When he responded to that petition, Tate took the opportunity to again argue (among other points) that his claims against the Addus defendants were not groundless. R. 140. After reviewing the initial fee petition, the district court found it inadequate to make an informed assessment as to the fees to which the Addus defendants were entitled; it therefore ordered a supplemental fee petition supplying more precise detail as to how the fees were incurred. R. 146. An amended fee petition complying with the court's order was filed. R. 147. Tate filed a response to the amended petition as well, again arguing at some length that the claims against the Addus defendants were not frivolous. R. 149.

After reviewing the briefing on the original and amended fee petitions, the district court granted the requested fees and costs: $79,838.00 in attorney's fees, $5,213.00 in parapro-fessional fees, and $7,175.17 in costs, for a total award of $92,226.17. *Tate v. Ancell*, 2012 WL 2521614 (S.D. Ill. June 28, 2012). The court noted that Tate had voiced no objection with respect to the billing rates of defense counsel, *id.*, at *1, which the court independently found to be reasonable, *id.*, at *2. Tate had objected to the reasonableness of the time billed for certain items; the court addressed each of these objections individually and overruled them. *Id.*, at *3. Tate had also argued that if indeed all of the claims against the Addus defendants were frivolous, then the court should have dismissed them at the outset of the case rather than allowing the case to proceed to summary judgment and thereby permitting defense fees to accumulate. The court rejected this argument, noting that at the pleading stage it was obliged to accept Tate's factual allegations as true and grant him the benefit of all reasonable inferences. *Id.*, at *4. The court also pointed out that it had dismissed some claims that were not legally cognizable, including some for which the Addus defendants could not be liable. That pruning in itself had been challenging, because the "original complaint was a huge ball of confusion in that plaintiff commingled various claims against the numerous defendants he sued." *Id.* Only at the summary judgment stage had it become

apparent that Tate lacked the requisite factual support for any of his claims against the Addus defendants, including the notion of a conspiracy between the State and the Addus defendants. At that time it was clear that the case against the Addus defendants was "made up of many misrepresentations and was absolutely frivolous from the beginning of the case. The case against the Addus defendants should never have been brought and had plaintiff's counsel done his homework beforehand these claims would not have been brought." *Id.*, at *5.

Finally, although the Addus defendants, in moving for fees under section 1988, implicitly had asked that the liability for fees be placed on Tate, the court *sua sponte* decided that Fedder should bear the responsibility pursuant to section 1927. "[P]laintiff should not have to shoulder this hefty bill based on his lawyer's malfeasance for filing and pursing such a frivolous case against defendants who did not belong in this case." *Id.* The court cited its authority under this statute to require an attorney to pay his opponent's fees in cases where the attorney's conduct reflects subjective or objective bad faith, including cases in which an attorney fails to timely abandon claims that are no longer viable. Fedder's conduct, the court concluded, met the statute's criteria: "Clearly, attorney Fedder's conduct in this litigation as to the Addus defendants has been unreasonable and vexatious." *Id.* It therefore imposed the obligation to pay the Addus defendants' costs and fees on Fedder.

Section 1927 provides that "[a]ny attorney…who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." We recognized in *In re TCI Ltd.* that section 1927 is consistent with the American Rule that requires each party to bear its own fees unless one side acts in bad faith. 769 F.2d 441, 445-46 (7th Cir. 1985). Proof of subjective bad faith will of course support the imposition of fees under section 1927. *Id.* at 445 (noting that subjective bad faith or malice will support section 1927 sanctions when the claim is colorable, but a lawyer pursues the claim for improper purpose of harassing opponent rather than to pursue recovery on the claim). But subjective bad faith is not necessary. Rather, sanctions may be imposed against an attorney "who has demonstrated 'subjective *or* objective bad faith.'" *Moriarty ex rel. Local Union No. 727 v. Svec*, 429 F.3d 710, 722 (7th Cir. 2005) (quoting *Pac. Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 120 (7th Cir. 1994) (emphasis ours)); *see also Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006) (collecting cases). As we explained in *TCI*:

> "Bad faith" sounds like a subjective inquiry… Despite its sound, however,
> "bad faith" has an objective meaning as well as a subjective one. *See Knorr*
> [*Brake Corp. v. Harbil, Inc.*], *supra*, 738 F.2d [223] at 226-27 [(7th Cir. 1984)]
> (summarizing and reconciling this circuit's cases on § 1927). A lawyer has a
> duty, which the recent amendment to Rule 11 emphasizes, to limit litigation

to contentions "well grounded in fact and…warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Fed. R. Civ. P. 11. If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious. To put this a little differently, a lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law. Our court has long treated reckless and intentional conduct as similar, *see Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S. Ct. 225 (1977). *See also Optyl Eyewear Fashion International Corp. v. Style Cos.*, 760 F.2d 1045, 1048 (9th Cir. 1985) (§ 1927 allows a remedy in the event of bad "intent, recklessness, or bad faith"). A lawyer's reckless indifference to the law may impose substantial costs on the adverse party. Section 1927 permits a court to insist that the attorney bear the costs of his own lack of care.

769 F.2d at 445. *See also Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013), *pet'n for cert. filed* (U.S. Nov. 18, 2013) (Nos. 13-619, 13A256); *Dal Pozzo*, 463 F.3d at 614; *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005); *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir. 1992); *see also Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (applying fee-shifting provision of Age Discrimination in Employment Act, 29 U.S.C. § 626(b)). Fedder suggests that *TCI*, insofar as it permits fee-shifting without proof of subjective bad faith, is out of step with both the statute and the traditional American Rule that *TCI* itself acknowledges. But we have now adhered to and repeated *TCI*'s holding that objectively unreasonable conduct is sufficient to support sanctions under section 1927 for over a quarter of a century. And, indeed, as the First Circuit has observed, this represents the majority understanding among the circuits. *Jensen v. Phillips Screw Co.*, 546 F.3d 59, 64 (1st Cir. 2008) (collecting cases).

Garden variety negligence by itself is insufficient to support a fee award under section 1927. *See Grochocinski*, 719 F.3d at 799; *Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006); *Kotsilieris*, 966 F.2d at 1184-85. Rather:

We have explained that a court has discretion to impose § 1927 sanctions when an attorney has acted in an "objectively unreasonable manner" by engaging in "serious and studied disregard for the orderly process of justice," *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 119 (7th Cir. 1994); pursued a claim that is "without a plausible legal or factual basis and lacking in justification," *id.*, or "pursue[d] a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound," *Kapco Mfg.*

> *Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989). We have also interpreted § 1927 "to impose a continuing duty upon attorneys to dismiss claims that are no longer viable." *Dahnke v. Teamsters Local 695*, 906 F.2d 1192, 1201 n.6 (7th Cir. 1990).

*Jolly Grp.*, 435 F.3d at 720.

The fact that the Addus defendants did not ask the court to impose sanctions under section 1927, and that the court instead did so on its own motion, is immaterial. "Of course, a district court acting under § 1927 is not bound by the parties' motions and may, in its sound discretion, impose sanctions *sua sponte* as long as it provides the attorney with notice regarding the sanctionable conduct and an opportunity to be heard." *Jolly Grp.*, 435 F.3d at 720 (citing *Johnson v. Cherry*, 422 F.3d 540, 551-52 (7th Cir. 2005)).

Nor does the opportunity to be heard invariably portend an evidentiary hearing. "Where the sanctionable conduct occurred in the presence of the court, there are no issues that a hearing could illuminate and hence the hearing would be pointless." *Kapco Mfg.*, 886 F.2d at 1495 (citing *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1201-02 (7th Cir. 1987)). Fedder notes that the district court had never conducted any in-person hearings with counsel during the life of the case; but that is neither here nor there. The relevant conduct took place in writing—in the complaints that Fedder filed on Tate's behalf, and in the memoranda he filed in opposition to the motions to dismiss and for summary judgment, which set forth the legal and factual bases for each of Tate's claims. The district court obviously was a witness to those pleadings, having ruled on all of the various motions.

So the only real question is whether Fedder had a meaningful opportunity to address whether the suit against the Addus defendants was frivolous, as the defendants contended it was, and whether he should be held responsible for any sanctions, as the district court ultimately determined he should be. So long as counsel had notice that opposing party was seeking sanctions and counsel had an appropriate opportunity to respond, that is all that is required. *Dal Pozzo*, 463 F.3d at 613.

In a threshold challenge to the sanctions, Fedder argues that the district court never gave him notice that it was contemplating requiring him, as opposed to his client, to pay the Addus defendants' costs and fees, and consequently he was deprived of the opportunity to address the court's concerns and show why he should not be sanctioned, or should not be sanctioned to the extent that he was.

Fedder has a point about the lack of notice. The Addus defendants sought recovery of their fees pursuant to section 1988(b), which, as we have noted, permits the court to impose an obligation to pay the prevailing party's fees on the losing party but not that party's attorney. Not until it actually approved the Addus defendants' fee petition and awarded

them fees and costs in a certain amount did the court, on its own initiative, impose the obligation to pay those fees and costs on Fedder pursuant to section 1927. We have said more than once that if the court is contemplating sanctions against an attorney *sua sponte*, it must so inform counsel and give him the chance to respond. *See Johnson*, 422 F.3d at 551-52 (collecting cases); *Jolly Grp.*, 435 F.3d at 720. Fedder was given no such warning, and thus did not have the opportunity to address the court as to his own prospective liability under section 1927.

This is not to say that Fedder had no opportunity to address whether the claims against the Addus defendants were *frivolous*; Fedder had multiple and more than adequate opportunities to address that core point. Needless to say, the Addus defendants' motion for section 1988 fees laid out their theory as to why the case against them was groundless and why an award of fees was warranted. Fedder had the opportunity to respond to the motion on Tate's behalf, but instead remained silent in the four-plus months before the court ruled on the motion. Fedder would later represent to the district court, as he has to this court, that he was unable to file a response during that time period because he needed to spend time with his mother, who had recently suffered a brain hemorrhage. R. 134 at 4. Yet, Fedder certainly could have asked the court to delay ruling on the motion until such time as he had more of an ability to respond. Although Fedder claims he was not aware of the motion, there is no dispute that he was served with a copy. *See* R. 125 at 4, R. 126 at 10. Additionally, one of the Addus defendants' attorneys sent him an email indicating that the Addus defendants were prepared to withdraw their request for attorneys' fees if Tate would agree to withdraw his pending appeal of the district court's summary judgment ruling, R. 139-2 at 2. And, during the same time that the fees motion was pending, Fedder filed multiple documents in connection with the summary judgment appeal in this court, including Tate's opening brief. So, like the district court, we can discern no reason why Tate, through Fedder, could not have responded to the request for fees.

Moreover, Fedder did avail himself of multiple subsequent opportunities to contest the Addus defendants' contention that the case against them was frivolous. Fedder made these arguments in Tate's motion to reconsider the court's initial decision to award fees and his reply memorandum in support of the same. He also made such arguments in opposition to the original and amended fee petitions that the Addus defendants filed after the court agreed to award them their fees. So Fedder, on Tate's behalf, had multiple, significant opportunities to argue why the case was not legally and factually groundless and why sanctions in the form of an attorney fee award were not warranted.

Consequently, the sole point that Fedder was deprived of the opportunity to address *ex ante* was whether he rather than his client should bear the burden of reimbursing the Addus defendants for their fees and costs; but Fedder has not convinced us that he was

materially harmed by the deprivation. The Addus defendants' request for sanctions was never based on actions that Tate, as opposed to his counsel, took. Their contention instead was that the claims against the Addus defendants lacked a reasonable basis in law and in fact and thus should not have been pursued. Regardless of whether the sanctions were sought against Tate or Fedder, Fedder had the opportunity to address the *basis* for the sanctions; and his arguments on that subject would not have differed had he known in advance that the court might decide to hold him rather than his client responsible for the Addus defendants' fees.

Fedder has listed a number of points that he might have addressed (or addressed differently) had he been placed on notice that the sanctions might be imposed on him. Most of these boil down to legal arguments as to what findings are necessary to support the imposition of sanctions pursuant to section 1927 and whether the district court's findings here support its sanctions decision. As such, they are arguments that Fedder can make and indeed has made on appeal; the inability to make them below has not harmed him. Only two of the points Fedder has identified are circumstance-specific and relate uniquely to his own liability for the sanctions, and, if relevant to the court's analysis under section 1927, potentially might have influenced the court's discretionary decision to sanction Fedder: his ability to pay, and the need to deter.

The first of these is, as a matter of law, immaterial under this circuit's case law: we have expressly held that an attorney's ability to pay is not relevant to the imposition of sanctions under section 1927. *Shales v. Gen. Chauffeurs, Sales Drivers & Helpers Local Union No. 330*, 557 F.3d 746, 749 (7th Cir. 2009); *see* Seth Katsuya Endo, *The Propriety of Considering an Attorney's Ability to Pay Under § 1927*, 61 DRAKE L. REV. 291, 297-304 (2013) (surveying circuit split on this question). An award under section 1927 turns on a finding of bad faith – although, as we have explained above, subjective bad faith is not required. *Shales*, 557 F.3d at 749; *see also Grochocinski*, 719 F.3d at 799 ("Sanctions against counsel under 28 U.S.C. § 1927 are appropriate when 'counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders.'") (quoting *Kotsilieris*, 966 F.2d at 1184-85). Thus:

> A violation of § 1927 is a form of intentional tort. And there is no principle in tort law that damages depend on a tortfeasor's assets. Quite the contrary. Damages depend on the victim's loss, not the wrongdoer's resources. …

*Shales*, 557 F.3d at 749. Moreover, as we have also indicated before, section 1927 sanctions are meant to compensate the party injured by an attorney's misconduct and to compel the offending attorney to shoulder the costs that his own lack of care has imposed on the opposing party. *Ordower v. Feldman*, 826 F.2d 1569, 1574 (7th Cir. 1987) (quoting *TCI*, 769

F.2d at 445). So Fedder's argument that he was deprived of the opportunity to establish that he lacks the ability to pay, in full or in part, the Addus defendants' fees, is a non-starter. (We would also note that Fedder has not made any showing that he would have a meritorious case to make on this point, if it were relevant.)

The same reasoning may well apply to Fedder's contention that he was deprived of the opportunity to argue that a lesser sanction (or no sanction at all) would be sufficient to deter him from repeating his misconduct. Certainly it is true that section 1927 sanctions serve a deterrent as well as a compensatory purpose. *See, e.g., Riddle & Assocs.*, 414 F.3d at 835 ("The purpose of § 1927 'is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs also bear them.'") (quoting *Kapco Mfg.*, 886 F.2d at 1491); *cf. Samuels v. Wilder*, 906 F.2d 272, 276 (7th Cir. 1990) ("We remind counsel…that Rule 11 and § 1927 are *sanctions* rules, not compensation devices. Persons required to pay sanctions have no entitlement to a perfect match between the award and the defendants' legal fees…") (emphasis in original). It does not necessarily follow, however, that the deterrent role played by section 1927 sanctions requires a court to ascertain the most modest sanction that will deter an offending attorney (and others) from further misconduct and then to set the sanction at that amount, regardless of the costs that the offending attorney's conduct has imposed on his opponents. Whereas that obligation is incorporated into the express terms of Rule 11, for example, *see* Fed. R. Civ. P. 11(c)(4), section 1927 has no such parsimony provision. *See Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1205-06 (10th Cir. 2008). As the First Circuit has observed:

> Unlike Rule 11, which finds its justification exclusively in deterrence, it is not clear from the face of section 1927 whether the statute is primarily compensatory or deterrent in nature – and, accordingly, whether or not the amount of a sanction must be set, as under Rule 11, at the minimum level necessary to deter repetition of the offending conduct or comparable conduct by others. The legislative history of section 1927, to the extent it provides any guidance, suggests both deterrent and compensatory intent. …

*Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 247 (1st Cir. 2010) (internal quotation marks and citations omitted); *see also Haynes v. City & Cnty. of San Francisco*, 688 F.3d 984, 987-88 (9th Cir. 2012) ("The purpose of § 1927 may be to deter attorney misconduct, or to compensate victims of an attorney's malfeasance, or to both compensate and deter."). Our own cases tend to talk about deterrence and compensation hand in hand when it comes to section 1927. *See, e.g., Riddle & Assocs.*, 414 F.3d at 835; *TCI*, 769 F.2d at 445-46. This may be our way of recognizing that when we shift all of the costs of frivolous and abusive litigation practices from the wronged to the wrongdoer, we are, in compensating the aggrieved party

for its injury, necessarily deterring the sanctioned attorney and the bar generally from engaging in similar behavior. As to whether compensation or deterrence takes precedence in the sanctions determination, cases like *Shales* and *TCI*, in suggesting that the offending attorney's financial resources are irrelevant, suggest that compensation takes the front seat. *See Shales*, 557 F.3d at 749 ("Damages depend on the victim's loss, not the wrongdoer's resources."); *TCI*, 769 F.2d at 445 ("A lawyer's reckless indifference to the law may impose substantial costs on the adverse party. Section 1927 permits a court to insist that the attorney bear the costs of his own lack of care."). This would be consistent with the language of the statute, which does not mention deterrence but which expressly grants the court discretion to order the offending attorney "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such [unreasonable and vexatious] conduct." § 1927. On the other hand, deterrence may take on independent significance when the amount necessary to compensate the victim is relatively modest (as when a claim is so obviously frivolous that it is dismissed at the outset of litigation, with little to-do and few fees incurred), and the court believes a heavier sanction is necessary to deter the offending attorney (and/or others) from making the same mistake again. *See Samuels*, 906 F.2d at 276. But we need not decide this question now.

Let us assume that deterrence would be a basis on which to argue that the court should impose a sanction less than the total amount of fees and costs resulting from an attorney's frivolous and abusive behavior: What argument to that end would Fedder have to make? The answer is, we do not know, because beyond saying that he was deprived of the opportunity to make an argument on the subject of deterrence to the district court, Fedder has not articulated a specific deterrence argument that he would have made, let alone shown why that might have convinced district court to alter its sanctions decision. This is unacceptable. As with any procedural error, counsel must demonstrate that he was harmed by the error in order to establish a basis for reversal; the failure to grant notice and an opportunity to be heard, like any other error, can be harmless. Fed. R. Civ. P. 61; *see*, *e.g.*, *El-Gazawy v. Holder*, 690 F.3d 852, 860 (7th Cir. 2012); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993); *Timms v. Frank*, 953 F.2d 281, 286 (7th Cir. 1992).

In sum, we conclude that Fedder has failed to establish that he was materially harmed by the district court's failure to warn him that it might impose sanctions pursuant to section 1927, and thus hold him personally liable for the Addus defendants' fees, rather than under section 1988. The procedural history of the case reveals that Fedder had multiple opportunities to address the basis for the requested sanctions—the legally and factually frivolous nature of the claims against the Addus defendants. And Fedder has failed to show that the lack of notice deprived him of an opportunity to make a potentially meritorious argument as to the extent of his own liability, as Tate's counsel, for having pursued those claims.

We turn, at last, to the merits of the district court's sanctions decision, which we review deferentially for abuse of discretion. *E.g.*, *Dal Pozzo*, 463 F.3 at 614. For the reasons that follow, we conclude that the district court did not abuse its discretion in requiring Fedder to pay the Addus defendants' fees and costs pursuant to section 1927. Our goal is not to provide a comprehensive list of all of the reasons why the claims against the Addus defendants were groundless. Rather, we are highlighting here the reasons we think to be most important and most indicative of Fedder's unreasonable decision to assert these claims and to keep pursuing them on Tate's behalf until the district court entered summary judgment in favor of the Addus defendants.

Fedder's poor judgment is evident from the claims made against the Addus defendants at the outset of the case under both Title VII and the ADA. Only an employer can be liable under those two statutes, and Addus was not Tate's employer. *See, e.g.*, *Small v. Chao*, 398 F.3d 894, 897-98b (7th Cir. 2005). There has never been any contention, nor any evidence to support the notion, that Addus and its personnel had any employment authority over Tate—who of course was a state employee working for DRS – let alone that they took any adverse employment action against Tate, *see, e.g. Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007). Indeed, when the Addus defendants sought on this basis to dismiss the ADA and Title VII claims against them, Tate (through Fedder) not only acknowledged that such claims were not viable as against the Addus defendants, but stated that—despite naming the Addus defendants on these claims—Tate did not actually intend to assert these claims against the Addus defendants. R. 26 at 6.

Tate's (conceded) inability to sue the Addus defendants under the ADA and Title VII left his conspiracy theory as the only means of attempting to hold those defendants liable for the employment actions taken against him: as discussed, he theorized that the Addus defendants conspired with the State defendants to retaliate against Tate for his involvement with his coworker's EEOC claim and otherwise to discriminate against him. Tate invoked sections 1981 and 1983 as the legal foundations for his theory. In relevant part, section 1981 provides that all persons shall have the same right to make and enforce contracts as white persons. This statute therefore prohibits racial discrimination in contract-making, including racial discrimination in employment, and extends to retaliation claims. *See, e.g.*, *Smith v. Bray*, 681 F.3d 888, 892, 895-96 & n.2 (7th Cir. 2012). It also applies to private as well as state actors, *Patterson v. McLean Credit Union*, 491 U.S. 164, 171-76, 198 S. Ct. 2363, 2369-2372 (1989); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 392 n.2 (7th Cir. 2007), *aff'd on other grounds*, 553 U.S. 442, 128 S. Ct. 1951 (2008). Section 1983 grants a broad right to sue for the deprivation of one's rights under the Constitution and laws of the United States, including as relevant here one's rights under the equal protection clause of the Fourteenth Amendment. *See Adickes v. S. H. Kress & Co., supra*, 398 U.S. at 150-52, 90 S. Ct. at 1604-05.

Although a claim under section 1983 must be premised on state rather than private action, a joint effort between public and private actors (including a conspiracy) can be characterized as state action. *See id.* at 152, 90 S. Ct. at 1605; *see also*, *e.g.*, *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013); *Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012).[2]

There were at least two problems with relying on sections 1981 and 1983 in this case. First, section 1981 addresses race-based interference with one's contractual rights, and Fedder never identified a shred of evidence suggesting that the Addus defendants were in any way motivated either by racial animus or a desire to punish Tate for having opposed racial discrimination. Tate's theory was that the alleged conspiracy was aimed at punishing him for having opposed sexual harassment in the workplace.

Retaliation was the gist of Tate's Fourteenth Amendment claim under section 1983. But we have repeatedly held that retaliation for one's efforts to oppose unlawful discrimination may be redressed under the First Amendment or Title VII, but not under the equal protection clause of the Fourteenth Amendment. *See Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004) (collecting cases); *see also Burton v. Ark. Sec. of State*, 2013 WL 6596923, at *12 n.7 (8th Cir. Dec. 17, 2013) (collecting cases). Fedder concedes that rule noted in *Boyd* bars his section 1983 claim, but suggests that his claim was supported by a good faith argument to reconsider *Boyd*'s holding in view of the Supreme Court's decision in *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 128 S. Ct. 1951 (2008), which held that section 1981's proscription of racial discrimination reached claims of retaliation for opposing racial discrimination. The problem, in the first instance, is that Tate made no such argument below; and even on appeal, he raised it only in his reply brief (in the summary judgment appeal), which of course is too late in the day. *See*, *e.g.*, *United States v. Kennedy*, 726 F.3d 968, 974 n.3 (7th Cir. 2013).

Finally, despite his dogged pursuit of the conspiracy theory on Tate's behalf, Fedder has never presented evidence that would support a finding that there was, in fact, a conspiracy between the Addus and the State defendants. We have addressed this point above in affirming the summary judgment ruling and will not repeat our analysis here. Several brief points are worth making in addition.

First, Fedder faults both the Addus defendants and the district court for highlighting Tate's deposition testimony acknowledging that he had no first-hand knowledge of the

---

[2] Separately, 42 U.S.C. § 1985(3) both proscribes and recognizes a citizen's right to sue for conspiracies aimed at depriving him of his rights to equal protection and equal privileges and immunities under the law. Tate referenced section 1985(3) in his original complaint, but the district court dismissed this claim early in the litigation, *Tate v. Ancell*, 2009 WL 513751, at *9 (S.D. Ill. March 2, 2009), and Tate has not appealed the district court's ruling in this respect.

alleged conspiracy. Fedder is right to say that Tate's lack of first-hand knowledge hardly rules out the possibility that there was a conspiracy. More relevant, in our view, is Fedder's inability, even after discovery, to identify any evidence supporting a reasonable inference that there actually was a conspiracy. Coupled with Tate's admitted lack of knowledge as to the particulars, one naturally questions on what basis Fedder persisted in maintaining that there was such a conspiracy.

Second, we noted earlier the two sets of remarks by Farmer and by Humphrey that Fedder has characterized as bookends of the charged conspiracy. We have already explained why those statements, by themselves, would not support a jury finding that there was a conspiracy between the Addus and the state defendants. In his briefing on the sanctions order, Fedder has also cited the affidavits of Gayle Johnson, a retired DRS employee, and Suzanna Jordan, who worked for Addus for a period of five months, representing that they were both asked to spy on Tate. *See, e.g.*, Fedder Reply Br. 22. Proof along these lines would have put at least *some* meat on the bones of Tate's theory that there was a conspiracy between the Addus and the State defendants. In fact, however, neither Jordan's nor Johnson's affidavit actually says that she was asked to spy on Tate.

Johnson's affidavit reveals that this was simply her own supposition, not that Ancell actually asked her to spy on Tate. Johnson averred that, several months after her retirement in 2006, she explored the possibility of returning to work for DRS in the Anna office on a part-time basis and ultimately discussed it with Ancell. According to Johnson, Ancell, who was managing both the Anna and Carbondale offices of DRS and who was only present in the Anna office one or two days a week, told her that she needed someone to let her know exactly what was going on in the Anna office, including what the staff there was doing, and to report to her on a daily basis. Johnson, being "somewhat aware that there had been problems in the Anna office between Mr. Tate and Ms. Ancell but…not know[ing] much about it," said that she "came to the conclusion that Ms. Ancell was asking me to be an informant regarding Mr. Tate…." R. 103-6 at 8-9 ¶¶ 71-72. Johnson, who felt uncomfortable about that prospect, turned down Ancell's offer. What is clear from Johnson's affidavit is that she simply surmised that she was being asked to spy on Tate, not that Ancell actually asked her to spy on anyone in particular, let alone Tate; and the basis for her supposition is far from clear. Thus, when Fedder stated in his brief that "Gayle Johnson testified that she was asked by Ancell to spy on Tate as a condition of being hired through Addus," Fedder Sanctions Reply Br. 22, he was misrepresenting the record.

Jordan's affidavit is even weaker in this regard. Jordan was an Addus employee who was assigned to the Anna office in August 2005. Jordan averred that Ancell asked her to report anything in the Anna office that she thought was wrong "or if I heard the staff say anything about her." R. 103-7 at 1 ¶ 11. She goes on to state, "Over time, I came to realize

that what Ms. Ancell was asking me to do was to spy on the other staff members. She wanted me to get information for her to use against them." *Id.* ¶ 13. Jordan silently demurred. "She [Ancell] would ask me about what was going on with the rest of the staff, and I was polite about it, but I never reported anything back to her. I basically just told her everyone was doing their jobs." *Id.* at 2 ¶ 15. Again, it was Jordan's supposition that Ancell was asking her to spy, and, in contrast to Johnson, Jordan did not infer that Ancell was asking her to spy on Tate in particular. Fedder's brief, which represents that "Suzie Jordan testified that she was hired by Addus to spy on Tate…,"Fedder Reply Br. 22, misstates the content of her affidavit.

Such misstatements of the evidence make it easy to appreciate why Judge Herndon remarked that "the case plaintiff's counsel filed on behalf of his client as to the Addus defendants was made up of many misrepresentations and was absolutely frivolous from the beginning of the case." 2012 WL 2521614, at *5. Fedder has done himself no favors in challenging the fee award by repeating on appeal the very sorts of mistakes that led the district court to impose sanctions under section 1927.

For these reasons, we conclude that the district court did not abuse its discretion in requiring Fedder to compensate the Addus defendants for their costs, including their attorneys' fees. Fedder's objective bad faith in pursuing the claims against the Addus defendants is established by the obvious gaps in the evidentiary basis for those claims and Fedder's misrepresentation of the evidence. Having to litigate the case through summary judgment imposed substantial expenses on the defendants and also wasted a significant amount of the district court's time.

## IV.

For the reasons discussed in this order, the district court properly entered summary judgment in favor of the defendants. The district court also acted within its discretion in requiring Tate's attorney to reimburse the Addus defendants for their costs and attorneys' fees pursuant to section 1927. The judgments in Nos. 11-3252 and 12-2694 are therefore AFFIRMED.